2003 ME 53

**Tamara L. JARVIS**

v.

**Robert G. JARVIS.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Feb. 26, 2003.

Decided: April 16, 2003.

Richard L. Currier, Currier & Trask, P.A., Presque Isle, for plaintiff.

Jillian Aldebron, Presque Isle, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Robert Jarvis appeals from an order of the District Court (Presque Isle, *Griffiths, J.*) modifying the original divorce judgment. He argues that the District Court erred in: (1) finding that there had been a substantial change in circumstances justifying modification; (2) ordering contact between him and his older daughter when she is distressed by and refuses the contact; (3) ordering him to pay support that exceeded 60% of his disposable income without addressing his subsistence needs; (4) requiring him to provide health insurance for his two daughters; and (5) ordering him to reimburse Tamara Jarvis for her legal fees.

[¶ 2] Because the trial court made inadequate findings regarding Robert Jarvis's income and failed to consider the totality of his financial circumstances in fashioning its order, we vacate and remand for further proceedings.

## I.  CASE HISTORY

[¶ 3] Robert and Tamara Jarvis were divorced by an order of the District Court

(*Klaila, CMO*) in September 2000. The order directed that the couple's minor daughters were to reside with Tamara. Robert was to have visitation rights every other weekend from Friday at 5 p.m. to Sunday at 5 p.m., with visitation on alternate weekends from 1 p.m. Saturday to 5 p.m. Sunday and at all other reasonable times. Robert was to pay $144 weekly in child support and maintain health insurance for the children, if it was available through his employer at a reasonable cost.

[¶ 4] On October 9, 2001, Tamara filed a motion to modify the divorce judgment with respect to the child support and Robert's rights of contact. Tamara alleged that (1) the contact schedule between the children and Robert had changed; (2) she had become a student at Northern Maine Technical College (NMTC), allowing her to work less and, consequently, earn less income; (3) she was being denied telephone contact with her daughters while they visited Robert; and (4) she and Robert could not agree on the above issues.

[¶ 5] Mediation was held on May 9, 2002. Robert, who was unrepresented at the time, agreed to pay $163.38 in weekly child support. On May 17, 2002, Robert filed a revised child support affidavit, stating that he had changed jobs and was now working for the Town of Fort Fairfield, earning $7.50 hourly ($300 weekly for a 40–hour week). On July 26, 2002, Robert filed another revised child support affidavit with an attached pay stub, stating that his expected income for 2002 was approximately $16,000.

[¶ 6] At the hearing on the motion to modify, Tamara testified that Robert's visitation patterns had changed over time, going from most weekends to every other weekend and some days during the week. She also stated that Robert had canceled several visits within a six to seven month period. Robert acknowledged that he had cancelled a few visits, testifying that this had occurred because of his work schedule at his former job.

[¶ 7] At the time of the divorce, Tamara worked at the Aroostook Medical Center as a certified nurse's assistant monitor technician. After the divorce, she enrolled in school and began working toward her R.N. license by taking classes at Northern Maine Technical College in hopes of improving her earning capacity. Tamara was preparing to sit for her LPN boards on August 5, 2002, and would thereafter be working one or two 7 a.m. to 7 p.m. shifts on the weekends while she continued to study. Tamara acknowledged that, because her reduced work schedule was a matter of her choice, she should be deemed to have an annual income of $15,000.

[¶ 8] Robert also changed employment in May 2002, and began working for the Town of Fort Fairfield, tending to the buildings and grounds. He testified that, after having worked at Northeast Packaging for approximately twelve years, he changed jobs because he was previously required to work overtime, his work schedule had interfered with his time with his children, and the factory was using new solvents that made him nauseous. Although he would be starting out at $7.50 per hour, Robert expected periodic pay raises that would, within a few years, return him to the same pay, $11.50 per hour, that he had been earning at Northeast Packaging.

[¶ 9] Robert testified to having difficulty visiting with his older daughter, because she refused to attend visits with him. Both Robert and his fiancée testified that, during her visits, his older daughter missed her mother, sometimes she would become ill, and the visits often ended with Tamara's mother coming to pick her up. The younger daughter is described as a

happy child who enjoys visits with her father.

[¶ 10] At trial, Robert testified that he was presently unable to afford health insurance through the Town of Fort Fairfield, because coverage for him and his daughters would cost in excess of $600 per month. His prior health insurance policy, through Northeast Packaging, had cost approximately $250 per month.

[¶ 11] At the conclusion of the hearing, the court invited each party to submit a draft order to reflect what each party requested to result from the hearing. On August 9, 2002, the court signed, without change, the draft order submitted by counsel for Tamara, resolving the issues presented in the motion to modify. The modification order that the court signed found that modification was justified by a sufficient change of circumstances and ordered that Robert: (1) "shall have contact [with the children] at all proper and reasonable times and places, including" alternate weekends for designated times, shared holidays and school vacations; (2) maintain health insurance coverage for the children; (3) pay Tamara $163.38 per week in child support for the couple's children; and (4) reimburse Tamara $1,195.94 for attorney fees incurred during this litigation.

[¶ 12] On August 21, 2002, Robert filed a motion for additional findings and proposed findings of fact and conclusions of law. M.R. Civ. P. 52(a). The District Court entered its findings of fact and conclusions of law on September 6, 2002, adopting, with one technical modification, findings proposed by Tamara. With respect to Robert's income, the court found that:

The Defendant's earning capacity and "gross income" as defined by 19–A M.R.S.A. § 2001.5 to be $30,874.00 based upon the Defendant's past earnings and income tax records. (See Defendant's Child Support Affidavits and income tax information). Defendant voluntarily left his previous employment during the pendency of this proceeding. His earnings and benefits are unclear at this time. Defendant testified he is in a probationary period but expects his income to increase at the end of this period. The best evidence in the record of Defendant's income are his wage statements (W–2's) and income tax returns which establish his earning capacity. See, *Harvey v. Robinson*, 665 A.2d 215 (Me.1995).

[¶ 13] The court also found that Robert was better able "to absorb the costs of litigation and has, to some extent, contributed to the costs incurred by the Plaintiff." This appeal followed.

## II. LEGAL ANALYSIS

[¶ 14] Initially in our analysis we reiterate what we have stated on several occasions over the past two decades: a trial court's verbatim adoption of findings or orders proposed by one party in a case is disfavored, as such an approach suggests that the court has not carefully reviewed the evidence or applied its independent judgment in making its finding and conclusions.[1] *In re Marpheen C.*, 2002 ME 170, ¶ 7, 812 A.2d 972, 974; *In re Allison H.*, 1999 ME 176, ¶ 7, 740 A.2d 997, 999; *Weeks v. Weeks*, 650 A.2d 945, 946 (Me.1994); *Clifford v. Klein*, 463 A.2d

---

1. This is not a case where the court stated findings and conclusions on the record and then directed one or both parties to draft an order to articulate in writing the judicially determined result. Such is a fully appropriate exercise of judicial authority. Here, the court invited each party to submit a draft order without any direction as to what the order should contain.

709, 711–13 (Me.1983); *In re Sabrina M.,* 460 A.2d 1009, 1012 (Me.1983).

[¶ 15] We recognize that fact-finding and decision-making can be aided by parties submitting and trial court's considering and utilizing, when appropriate, draft findings or orders. But a key question on review, when draft orders are adopted without change, or with little material change, will be whether the findings and order reflect the application of judgment by the court, and not simply one of the parties. *See Marpheen C.,* 2002 ME 170, ¶ 7, 812 A.2d at 974. "[A]lthough it is not automatic error to adopt one party's proposed findings, . . . we generally scrutinize such findings to insure that the court properly performed its judicial function." *In re Allison H.,* 1999 ME 176, ¶ 7, 740 A.2d at 999 (citations omitted).

[¶ 16] With this background, we look to the specific issues raised in this appeal.

A. Calculation of Income

[¶ 17] Robert argues that the District Court erred when it based his child support obligation on an income of $30,874 instead of his actual income at the time, which he reported to be $16,000 in his June 25, 2002, affidavit. He asserts that the court erred in imputing income to him, because it did not first make a finding that he was underemployed pursuant to 19–A M.R.S.A. § 2001(5)(D) (1998).

[¶ 18] Where, as here, a request for findings is made pursuant to M.R. Civ. P. 52(a), we do not assume that the trial court made all the findings necessary to support its judgment. *Bayley v. Bayley,* 602 A.2d 1152, 1153–54 (Me.1992). Instead, we review the original findings and any additional findings made in response to the motion for findings to determine if they are sufficient, as a matter of law, to support the result and if they are supported by the evidence in the record. *Id.*

[¶ 19] Section 2001(5)(D), defines gross income and provides, in pertinent part:

Gross income may include the difference between the amount a party is earning and that party's earning capacity when the party voluntarily becomes or remains unemployed or underemployed, if sufficient evidence is introduced concerning a party's current earning capacity.

[¶ 20] The court did not specifically state that it found Robert to be underemployed and it made no finding regarding his current earning capacity. The court found that Robert left his position voluntarily during the pendency of the hearing. Looking to Robert's W–2 statement and his 2001 tax returns, and apparently ignoring Robert's financial affidavit, his current pay stub, and his testimony concerning his current salary, the court found that Robert's income was "unclear at this time."

[¶ 21] Evidence at trial reflected that Robert accepted a job with the Town of Fort Fairfield, in part, so that he could spend more time with his daughters. He testified that his income for 2002 might be approximately $21,000 or $22,000, depending upon the amount of overtime he could acquire. Although Robert testified that he anticipated pay raises, he stated that he would not reach a pay rate that was comparable to his previous rate for two to three years. The pay stub that Robert filed indicated that he was earning $300 gross per week in his new job.

[¶ 22] The trial court had "a duty to make findings sufficient to inform the parties of the reasoning underlying its conclusions and to provide for effective appellate review." *Bayley,* 602 A.2d at 1153–54. In light of the evidence, the trial court's finding that Robert's income was unclear and its decision to impute $30,874 in income to Robert are erroneous. The trial court did not state its reasoning for ignoring Rob-

ert's current income and relying on his income of $30,874 from his former employment.

[¶ 23] Robert also contends that the court failed to address his subsistence needs in calculating child support, in violation of 19–A M.R.S.A. § 2006(5)(C) (Supp. 2002),[2] and awarded support in excess of the appropriate percentage of his disposable weekly earnings, in violation of 19–A M.R.S.A. § 2356 (1998). Robert, however, does not allege that his income is below the federal poverty guideline. Therefore, his reliance on section 2006(5)(C) is misplaced. *See Johnson v. Smith,* 1999 ME 168, 740 A.2d 579.[3]

[¶ 24] Regarding disposable income, 19–A M.R.S.A. § 2356 provides, in relevant part:

The following exemptions apply to weekly earnings. The maximum part of the aggregate disposable earnings of a responsible parent for any workweek that is subject to garnishment or income withholding may not exceed:

(1) **Supporting spouse or dependent child.** When the individual is supporting that individual's spouse or dependent child, other than a spouse or child with respect to whose support that order is used, 50% of that individual's disposable earnings for that week; or

(2) **Not supporting spouse or dependent child.** When the individual is not supporting such a spouse or dependent child described in subsection 1, 60% of that individual's disposable earnings for that week.

The term "disposable earnings" has been defined to mean "that portion of a person's income remaining after payment of taxes and other legal obligations." *Curtis v. Comm'r of Human Servs.,* 507 A.2d 566, 573 (Me.1986).

[¶ 25] Robert's disposable weekly earnings at the time of the hearing, if calculated according to the pay stub that he attached to his child support affidavit, are $249.54. Because Robert pays support for another daughter, to whom this order does not apply, we look to section 2356(1). Fifty percent of Robert's disposable income equals $124.77. The immediate income withholding order, however, withholds $163.38 weekly to satisfy Robert's support obligations. This amount is apparently in violation of the 50% limitation

2. 19–A M.R.S.A. § 2006(5)(C) (Supp.2002) provides:

The subsistence needs of the nonprimary care provider must be taken into account when establishing the parental support obligation. If the annual gross income of the nonprimary care provider is less than the federal poverty guideline, the nonprimary care provider's weekly parental support obligation for each child for whom a support award is being established or modified may not exceed 10% of the nonprimary care provider's weekly gross income, regardless of the amount of the parties' combined annual gross income. The child support table includes a self-support reserve for obligors earning less than $12,600 per year. If the nonprimary care provider's annual gross income, without adjustments, is in the self-support reserve, the amount listed in the table for the number of children is the nonprimary care provider's basic support obligation, regardless of the parties' combined annual gross income. The nonprimary care provider's proportional share of childcare, health insurance premiums and extraordinary medical expenses are added to this basic support obligation.

3. In *Johnson,* we stated that § 2006(5)(C) prompts the trial court to "evaluate the non-primary care provider's subsistence needs based on how his or her income correlates to the poverty guideline for one person." *Johnson,* 1999 ME 168, ¶ 9, 740 A.2d at 582. Furthermore, we noted that the legislature's intent was "that the federal poverty guideline for one person should serve as the touchstone for a section 2006(5)(C) subsistence needs analysis." *Id.* at ¶ 12, 740 A.2d at 583.

in 19–A M.R.S.A. § 2356(1), and must be reviewed on remand.

## B. Health Insurance

[¶ 26] Robert also argues that the court violated 19–A M.R.S.A. § 1653(8)(C) (1998)[4] when it ordered him to provide health insurance for his daughters' because he cannot procure affordable insurance through his present employer. We review such determinations for an abuse of discretion. *Dargie v. Dargie*, 2001 ME 127, ¶ 23, 778 A.2d 353, 358.

[¶ 27] Reasonable cost health insurance is defined in the court's child support order as "health insurance that is employment-related or other group health insurance." Robert testified that employment-related health insurance was available to him through his present position at the Town of Fort Fairfield, but at a cost of approximately $600 per month.

[¶ 28] Although "reasonable cost health insurance," as defined in the order, is available to Robert, ordering Robert to provide such insurance at the current cost was an abuse of discretion. Even if Robert's disposable income is calculated according to his former, higher salary, not his present salary, his monthly disposable income would total approximately $1,529.64 ($355.73/[5] week × 4.3[6] weeks/ month). Subtracting his monthly support obligations for only his and Tamara's two

daughters, which totals $703.14 ($163.52/ week × 4.3 weeks/month), the remainder of Robert's monthly income equals $826.50. Were he required, as the trial court ordered, to pay in excess of $600/month in health insurance premiums to cover his and Tamara Jarvis's two daughters, he would be left with approximately $226.50 per month on which to subsist. In addition, however, Robert has a monthly support obligation toward another daughter of approximately $195 per month. The aggregate court ordered obligations leave Robert with $31 monthly, not factoring in any living expenses. This sum is calculated based on Robert's former, higher income level. Requiring this level of payments was an abuse of discretion.

## C. Attorney Fees

[¶ 29] The Court ordered Robert to reimburse Tamara for $1,195.94 in attorney fees, pursuant to 19–A M.R.S.A. § 952(3) (1998). The court reasoned that Robert had the greater ability to absorb the costs of litigation and had "to some extent, contributed to the legal costs incurred by [Tamara]."

[¶ 30] The decision to award attorney fees is "within the discretion of the trial judge." *Largay v. Largay*, 2000 ME 108, ¶ 16, 752 A.2d 194, 198. We review the trial court's determination to award

---

4. 19–A M.R.S.A. § 1653(8)(C) (1998) provides:

The court may require the payment of part or all of the medical expenses, hospital expenses and other health care expenses of the child. The court order must include a provision requiring the obligated parent to obtain and maintain health insurance coverage for medical, hospitalization and dental expenses, if reasonable cost health insurance is available to the obligated parent. The court order must also require the obligated parent to furnish proof of coverage to the obligee within 15 days of receipt of a

copy of the court order. If reasonable cost health insurance is not available at the time of the hearing, the court order must establish the obligation to provide health insurance on the part of the obligated parent, effective immediately upon reasonable cost health insurance being available.

5. This amount appears on a one-week pay stub from Northeast Packaging.

6. The 4.3 figure is the factor commonly used to calculate monthly rates from known weekly rates.

attorney fees for an abuse of discretion. *Id.*

[¶ 31] Title 19–A M.R.S.A. § 952(3) provides that "[w]hen making a final decree, the court may order a party to pay reasonable attorney's fees. Attorney's fees awarded in the nature of support may be made payable immediately or in installments." We have stated that "[a]n award of attorney fees should be based on the parties' relative capacity to absorb the costs of litigation ... and all relevant factors that serve to create an award that is fair and just under the circumstances." *Largay,* 2000 ME 108 at ¶ 16, 752 A.2d 194 (internal quotations omitted).

[¶ 32] In light of the preceding analysis *concerning the trial court's order* that Robert provide health insurance through his employer for the couple's children leaving Robert with $31 monthly, the parties' relative capacity to absorb the cost of litigation appears equally poor. Given the facts found by the trial court and the obligations it imposed on Robert, the court abused its discretion in awarding attorney fees to Tamara. On remand, the court should evaluate the attorney fee issue in light of the facts it finds concerning the relative financial capacities of the parties.

## D. Modification of the Order

[¶ 33] Robert finally argues that the court erred in considering Tamara's motion to modify the parent-child contact schedule, because she failed to establish by a preponderance of the evidence that a substantial change in circumstances had occurred since the original divorce order was entered.

[¶ 34] Title 19–A M.R.S.A. § 1653(10) (1998) provides, in part, that "[u]pon the petition of one or both of the parents, an order for parental rights and responsibilities with respect to a minor child may be modified or terminated as circumstances require." In *Cloutier v.*

*Lear,* 1997 ME 35, ¶ 3, 691 A.2d 660, 662, we stated:

The question that the court must first consider on a motion to modify a custody arrangement is whether there has occurred since the prior custody order a change in circumstances sufficiently substantial in its effect upon the best interests of the children as to justify a modification of the custody arrangement.

(internal quotation marks omitted) citing *Ehrlich v. Bloom,* 585 A.2d 809, 812 (Me. 1991). The trial court is vested with significant discretion in its review of the sensitive issues of child custody and visitation. *See id.* at ¶ 4, 691 A.2d at 662.

[¶ 35] The trial court properly found that there was a sufficient change in circumstances to modify the September 7, 2000, divorce judgment. Parental contact had not been occurring every weekend and Robert had not been picking up the girls as frequently as he was during the week. Tamara had enrolled in NMTC as a student and now would be working as an LPN in one to two, twelve-hour weekend shifts per week. The parties were also unable to agree on drop off times that would accommodate Tamara's schedule. This evidence supports the trial court's finding that there was a substantial change in circumstances.

[¶ 36] Robert also argues that the court erred in its modification order because it used language that suggested mandatory contact between him and his daughters, one of whom often refused to participate in visitations or became ill during visits. However, Robert did not request additional findings or seek clarification of the court's order on this point.

[¶ 37] The District Court's August 9, 2002, order altered the language of the original divorce judgment, which stated that Robert had "the *right* to visit with and be visited by" the children, to read that "[t]he minor children *shall* ... have

contact with [Robert]" at the described times (emphasis added). Robert may be reading more into this change than intended by the court, and if his concern continues, it can be appropriately addressed by a request for clarification on remand.

The entry is:

Judgment is vacated. Remanded for further proceedings consistent with this opinion.