MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2013 ME 113
Docket:        Wal-13-125
Submitted
 On Briefs:    October 31, 2013
Decided:       December 24, 2013

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and JABAR, JJ.

## KRISTIN L. GORDON

v.

## JEFFREY M. CHESKIN

SILVER, J.

[¶1]   Jeffrey M. Cheskin appeals from a judgment of the District Court (Belfast, *Worth, J.*) granting Kristin L. Gordon's motion to modify the custody order concerning the parties' two minor daughters.  The effect of the order was to deprive Cheskin of overnight visitation with the girls.  Cheskin argues that several of the court's factual findings were clearly erroneous, and that the court erred by adopting every term of Gordon's proposed order.  Gordon concedes that the trial court's finding that Cheskin had been convicted of a crime was clear error, but asserts that this error was harmless.  We affirm the judgment.

## I. BACKGROUND

[¶2]  Cheskin and Gordon divorced in Pennsylvania in 2005.  They have two daughters, who were ages nine and twelve at the time of the hearing in this case.  A custody order issued in Pennsylvania on March 16, 2005, was superseded by the

2

parties' agreement to a second custody order, dated May 4, 2006. The second custody order permitted Gordon to move to Maine with the girls in the summer of 2006 and to maintain primary physical custody; it modified Cheskin's visitation schedule accordingly. The parties maintained shared parental rights and responsibilities, or "joint legal custody," of the girls.[1]

[¶3] Cheskin remarried in August 2006. He had a son with his second wife in November 2007. Cheskin and his second wife divorced in 2009. In 2011, Cheskin was charged in Delaware with offensive touching[2] and endangering the welfare of a child. The charges arose from an incident where, in response to being kicked while trying to change his three-year-old son into a swimming diaper, Cheskin grabbed his son's leg hard enough to leave a pink mark. Cheskin pleaded guilty to offensive touching. He was placed on probation with the condition that, if he successfully met the terms of his probation, the charge would be dismissed without a finding of guilt pursuant to the Domestic Violence First Offenders

---

[1] Pursuant to Pennsylvania law, "legal custody" means "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions." 23 Pa. Cons. Stat. Ann. § 5322(a) (West 2011).

[2] Pursuant to Delaware law, a person is guilty of offensive touching when the person:

> Intentionally touches another person either with a member of his or her body or with any instrument, knowing that the person is thereby likely to cause offense or alarm to such other person[.]

Del. Code Ann. tit. 11, § 601(a)(1) (West 2013).

Diversion Program in New Castle County, Delaware.[3] The charge of endangering the welfare of a child was not prosecuted.

[¶4]  Also in 2011, Cheskin's ex-wife—his son's mother—filed a complaint for protection from abuse against Cheskin.  A protection from abuse order, which was issued by agreement, remained in effect from May 2011 until May 2012. During that time, Cheskin had only supervised visits with his son.  At Gordon's insistence, Cheskin agreed that his visits with his daughters would be supervised during that time period as well.  Gordon supervised those visits herself.

[¶5]  Gordon filed a motion to modify the custody order in April 2012.[4] Cheskin's unsupervised visits with the girls resumed in the summer of 2012.  In July 2012, the Delaware Department of Services for Children, Youth and Their Families opened another investigation following an incident between Cheskin and his son, which the girls witnessed.  This incident involved Cheskin grabbing his son, who was misbehaving at an indoor play facility, and pushing him against a wall.

---

[3]  *See* Del. Code Ann. Tit. 10, § 1024 (West 2013).  Maine employs a similar procedural device, commonly referred to as a "deferred disposition," 17-A M.R.S. §§ 1348 to 1348-C (2012), although it is available to any person who pleads guilty to any Class C, Class D, or Class E crime, *id.* § 1348.

[4]  Gordon registered the Pennsylvania custody order with the Maine District Court in Belfast pursuant to 19-A M.R.S. § 1765(1) (2012) on August 1, 2011.  The District Court had jurisdiction to modify the order pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act, 19-A M.R.S. § 1731-1783 (2012), because Maine had become the children's home state and neither of the parties continued to reside in Pennsylvania, *id.* §§ 1745, 1747.

4

[¶6]   After the visit in the summer of 2012, both girls began to display symptoms of anxiety, including nail biting and crying.   One daughter had nighttime episodes of shaking so hard that her teeth would chatter; the other began to have problems with bedwetting.   Both girls began seeing a counselor in the summer of 2012.

[¶7] A hearing on Gordon's motion to modify the custody order was held before the Maine District Court in Belfast on January 16, 2013.   Gordon was concerned that the girls were not being properly fed or bathed while in Cheskin's care.  Both Gordon and her sister, the girls' aunt, testified that the girls would often return home hungry and head straight to the kitchen to eat upon returning from visits with Cheskin.  Cheskin admitted that he often deferred to the girls' decisions about when they wanted to bathe.  One daughter's asthma seemed to be aggravated after certain visits with Cheskin.  On one occasion, he took her on a hayride, even though she was allergic to hay.

[¶8]   The girls also frequently returned from visits with their father with unexplained bruises and scratches.   Gordon and her sister testified that, on one occasion, one of the girls returned from a visit with a split lip.  During the 2012 Thanksgiving visit, a cousin repeatedly struck the younger daughter in the face while the two children were playing without adult supervision.  Cheskin testified that he had spanked the girls in the past, but that as a result of the parenting and

domestic violence courses he was required to attend as part of his probation, he now believes that physical discipline is inappropriate.

[¶9]  Gordon provided the court with a proposed order that provided that when the children visited Cheskin in Delaware he would be required to drop them off at the nearby home of Gordon's sister every evening by 6:30 p.m.  The proposed order provided that Cheskin could have visitation with the girls in Maine over the Columbus Day and Martin Luther King holiday weekends, but only from 9:00 a.m. to 6:30 p.m. on Saturday and Sunday, and from 9:00 a.m. to 5:00 p.m. on Monday of those weekends.  It also provided that he could have five days of visitation during the girls' April vacation and fourteen days during July, subject to the same daily time restrictions.  Finally, it provided that Cheskin could have similar contact in Delaware with the girls during Thanksgiving through the following Saturday in even-numbered years, and from December 27 through December 31 in odd-numbered years.  Cheskin did not submit a proposed order. The only aspect of Gordon's proposed order that he challenged was that he would no longer be permitted to have overnight visits with the girls.

[¶10]  The court's order, dated January 24, 2013, included all of the terms Gordon proposed, including the elimination of Cheskin's overnight visits with the girls.  It also contained four pages of the court's own factual findings, which included a statement that Cheskin "was convicted" of offensive touching following

6

his guilty plea. The factual findings emphasized that the children appeared to be under-fed when they returned from visiting their father, that their hygiene was poor, and that they received unexplained bruises and other minor injuries. The order highlighted that Cheskin downplayed his problems with disciplining all three of his children, pointing out that he "disparaged [his son's] mother and said she was being vindictive against him" and that he "minimized his actions" when he testified at the hearing. The court expressed doubt that the domestic violence classes had changed Cheskin for the better, and concluded that he "lacks insight."

[¶11] Cheskin did not request further findings, nor did he file a motion to alter or amend the judgment. Instead, he filed this timely appeal.

## II. DISCUSSION

[¶12] A trial court's factual findings are reviewed for clear error, and they must stand if they are supported by any competent evidence in the record. *Harmon v. Emerson*, 425 A.2d 978, 981 (Me. 1981). Factual findings should not be overturned in an appellate proceeding "simply because an alternative finding also finds support in the evidence." *Id.* at 982. We defer to the trial court's determination of witnesses' credibility and its resolution of conflicts in testimony. *Blackmer v. Williams*, 437 A.2d 858, 863 (Me. 1981). A court's misstatement of fact should be disregarded if it does not affect the substantial rights of the parties. *Sanders v. Sanders*, 1998 ME 100, ¶ 17, 711 A.2d 124; M.R. Civ. P. 61.

[¶13]  We review the trial court's decision concerning custody for an abuse of discretion.  *Harmon v. Emerson*, 425 A.2d 978, 983 (Me. 1981).  Generally, a trial court's verbatim adoption of a party's proposed order is disfavored.  *Jarvis v. Jarvis*, 2003 ME 53, ¶ 14, 832 A.2d 775; *In re Allison H.*, 1999 ME 176, ¶ 7, 740 A.2d 997.  The key question on review, however, is whether the findings and order reflect the application of the court's independent judgment.  *Jarvis*, 2003 ME 53, ¶ 15, 832 A.2d 775.

[¶14]  Cheskin argues that the court's findings that the girls were inadequately fed and that he failed to take one daughter's asthma seriously were clearly erroneous.  However, competent evidence in the record supports each of these findings.  Although, as Cheskin points out, there was no direct evidence concerning the frequency with which he actually fed his daughters while they were in his care, Gordon testified that she believed that the girls were getting inconsistent meals when they visited Cheskin.  Gordon's sister also testified that the girls would run to the kitchen immediately after being dropped off by Cheskin, and that they seemed hungry.  Although Cheskin contends that it is not uncommon for children to be hungry, Gordon's testimony that the girls were not hungry when they were with her suggests that their behavior upon returning from visits with their father was, for them, unusual.  This evidence supports the trial court's finding; thus, we will not disturb it.

8

[¶15] Similarly, there is evidence in the record to support the court's finding that Cheskin did not take his daughter's asthma seriously. Contrary to Cheskin's assertions, Gordon's testimony constitutes competent evidence. Gordon testified that her daughter's asthma is often aggravated after she visits with Cheskin, and that Cheskin took her on a hayride, even though she is allergic to hay. The trial court evidently found this testimony to be credible; its finding on this point is not clearly erroneous.

[¶16] Cheskin also contends that the court committed clear error by finding that he had been "convicted" of offensive touching. This statement in the court's order is factually incorrect. Cheskin pleaded guilty to offensive touching. The Delaware court consequently ordered him to serve one year of probation, and to attend both anger management and parenting classes. In exchange for the guilty plea, the charge was eventually dismissed, with prejudice, without a finding of guilt. The application to participate in the Domestic Violence First Offenders Diversion Program states that a defendant's application constitutes "an admission of guilt in connection with the charge(s) in question." However, this disposition is explicitly described as "not a conviction for purposes of disqualification or disabilities imposed by law upon conviction of a crime." *See* Del. Code Ann. Tit. 10, § 1024(g) (West 2013). The court's order therefore misstates the consequence of Cheskin's guilty plea.

[¶17]   Here, the court's misstatement does not appear to have affected Cheskin's rights in any way.  Cheskin suggests that the trial court made a finding of domestic abuse, thus implicating 19-A M.R.S. § 1653(6) (2012) concerning conditions of parent-child contact in cases involving domestic abuse.  Under the facts of this case, however, whether Cheskin was actually convicted of the crime with which he was charged—and to which he pleaded guilty—would not have affected the court's decision.

[¶18]   A parent's conviction or adjudication for certain sex offenses gives rise to a presumption that any contact with that parent is not in the best interest of the child.  *See* 19-A M.R.S. § 1653(6-B).  However, convictions for other types of offenses do not give rise to a similar presumption.  The court must consider as primary the safety and well-being of the child when evaluating the best interest of the child for purposes of making an award of parental rights and responsibilities.  19-A M.R.S. § 1653(3).  To that end, the court must consider a number of factors; specifically, the court must consider the existence of *any* history of child abuse by a parent.  19-A M.R.S. § 1653(3)(M) (emphasis added).  This consideration is not limited to formal convictions for domestic violence offenses.

[¶19]   Deferred dispositions allow defendants in criminal matters to avoid some of the negative consequences of a criminal conviction.  In exchange, however, defendants must openly acknowledge and take responsibility for their

conduct. The dismissal of the charge after completion of the deferred disposition does not cast a blanket of confidentiality over the course of the proceedings up to that point. Although a defendant will not be subjected to the automatic collateral consequences of a criminal conviction, a court in a later proceeding is not precluded from considering the defendant's admission of guilt in open court. An admission to specific behavior may be considered in a later proceeding, if that behavior is relevant to the matter before the court. *See* M.R. Evid. 402, 801(d)(2)(A).

[¶20] Here, not only had Cheskin *previously* admitted that he was guilty of a criminal offense; he also testified at the hearing in this case and gave his own account of the events that resulted in the criminal charges being brought against him. The court was free to consider both Cheskin's behavior and his earlier guilty plea in conjunction with all of the other evidence to determine how to best serve the best interest of the children. Thus, the misstatement in the court's order was harmless.

[¶21] Cheskin also challenges the court's use of Gordon's proposed order, arguing that it shows that the court did not use its independent judgment in fashioning the provisions of the order. Although a court must exercise independent judgment, it is good practice for the court to request input from the parties. One way to accomplish this is to seek and review proposed orders. When used

appropriately, draft orders can aid in the fact-finding and decision-making process. *See Jarvis*, 2003 ME 53, ¶ 15, 832 A.2d 775. Here, the trial court made detailed factual findings summarizing its view of the evidence and testimony presented at the hearing. Neither party submitted proposed findings; the court's findings, which spanned several pages, were entirely its own. The court's findings indicate a careful review of the evidence, as well as the application of independent judgment. Under these circumstances, the court did not abuse its discretion by adopting the terms of child contact contained in Gordon's proposed order.

[¶22] We are similarly unpersuaded by Cheskin's assertion that the court provided insufficient findings to support its decision to eliminate overnight visitation. Contrary to Cheskin's assertions, the trial court was not required to make a finding of domestic abuse, explicit or otherwise, in order to terminate Cheskin's overnight visitation. The court may prohibit overnight parent-child contact in cases involving domestic abuse. 19-A M.R.S. § 1653(6)(B)(6). However, nothing in the statute prohibits the court from limiting contact to daytime visits even in cases where domestic abuse is not present, if it finds that to do so is in the best interest of the children. *See* 19-A M.R.S. § 1653(3). Gordon testified that she was requesting that the children spend the night with her or her sister so that she could ensure that the children were fed, bathed, and unharmed. The trial

court's findings suggest that the court, after hearing all of the evidence, shared her concerns; they are sufficient to support the result in this case.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Lisa J. Lattes, Esq., Camden, for appellant Jeffrey M. Cheskin

Kristin A. Gustafson, Esq., Gustafson Family Law, Augusta, for appellee Kristin L. Gordon

Belfast District Court docket number FM-2011-150
FOR CLERK REFERENCE ONLY