MAINE SUPREME JUDICIAL COURT                              Reporter of Decisions
Decision:    2018 ME 123
Docket:      Pen-16-543
Argued:      December 13, 2017
Decided:     August 21, 2018

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

RANDY N. OLIVER, II et al.

v.

EASTERN MAINE MEDICAL CENTER

HJELM, J.

[¶1]  In this action for professional negligence, Randy N. Oliver, II (Oliver) and Nicole Jernigan, individually and as personal representatives of the Estate of Randy N. Oliver, appeal, and Eastern Maine Medical Center cross-appeals from a judgment of the Superior Court (Penobscot County, *A. Murray, J.*).  *See infra* n.4.  Oliver and Jernigan challenge the part of the judgment concluding that EMMC was not negligent when it discharged their father, Randy N. Oliver (Randy), because the discharge was contrary to the instructions they gave to the hospital in their capacity as his court-appointed guardians.  Because the court did not err in its conclusions that, at the time he was discharged, Randy had regained capacity to make his own health-care decisions and that EMMC's discharge plan met the standard of care, we affirm the judgment on the liability

2

claim. EMMC appeals the court's denial of its request for costs for expert witness fees and expenses incurred during the prelitigation screening panel process. We also affirm that determination.

## I. FACTUAL BACKGROUND

[¶2] The following facts are drawn from the court's findings, which are supported by competent record evidence, and from the procedural record. *See In re Evelyn A.*, 2017 ME 182, ¶ 4, 169 A.3d 914.

[¶3] On March 21, 2013, Randy's daughter, Nicole Jernigan, and his ex-wife, Patricia Oliver, found Randy severely intoxicated in his home and took him to Eastern Maine Medical Center in Bangor. Jernigan and Patricia told EMMC staff that Randy lived alone in his home, which had no running water and presented significant sanitation issues. They also informed hospital staff that Randy had been defrauded of money by scammers.

[¶4] Randy was admitted to EMMC with diagnoses that included hepatic encephalopathy (liver-related brain damage), possible alcohol withdrawal, deterioration of functional status, and a neglected state. At the time of the admission, Randy had burns on his hands. During Randy's resulting hospitalization, Jernigan and Patricia provided staff with photographs of

Randy's home, which showed fire hazards inside. Jernigan also told the staff that items in the home had caught fire more than once.

[¶5] Randy remained hospitalized for nearly two months on a medical admission. Throughout that time, he asked to be discharged. Because of Randy's expressed and ongoing desire to leave, the hospital assigned him a one-on-one aide to prevent him from leaving.

[¶6] On March 22, the day after Randy's admission, a psychiatrist conducted an emergency psychiatric evaluation of Randy, during which Randy expressed a lack of understanding about why he was in the hospital. The psychiatrist concluded that Randy's alcohol addiction was "potentially lethal," that Randy likely suffered from "significant cognitive impairment that would be slow to resolve," and that a guardian might eventually need to be appointed.

[¶7] Nearly a week later, on March 28, a neuropsychologist, Anthony Podraza, examined Randy. Dr. Podraza found that Randy was a "fairly accurate historian," although Randy reported that his biggest problem was a faulty water heater at his house. Dr. Podraza was unable to complete the testing process because of Randy's poor motivation and lack of effort, but he was able to conclude that Randy did not have "capacity to manage simple or complex finances independently" or "to make informed decisions regarding his health."

4

[¶8]  On April 5, Oliver and Jernigan filed a petition in the Waldo County Probate Court to be appointed Randy's co-guardians.  In support of the petition, they submitted a report of a physician who had examined Randy on April 1 and concluded that Randy's prognosis was "probably poor for recovery of appropriate insight necessary for self care."   The court scheduled a guardianship hearing for May 7.  In the interim, a visitor appointed by the Probate Court, *see* 18-A M.R.S. § 5-303(b), (c) (2017), interviewed Randy and wrote a report recommending that a guardian be appointed and that Randy be placed in a secured dementia facility.

[¶9]  On May 7, the Probate Court (*Longley, J.*) held a hearing on the guardianship petition and, based on the physician's report generated by the April 1 evaluation,  appointed Oliver and Jernigan as Randy's co-guardians. Importantly for this action, the order stated that the guardians were authorized to "act only as necessitated by [Randy's] actual mental and adaptive limitations or other conditions warranting this procedure."

[¶10]  With the treatment provided at EMMC, Randy's condition began to improve.[1]  On the same day as the guardianship hearing, an EMMC hospitalist

---

[1]  Oliver and Jernigan do not allege that EMMC failed to provide Randy with proper medical care during his hospitalization.

who was involved in Randy's care ordered another neuropsychological examination after observing Randy and questioning the need for ongoing inpatient care. Dr. Podraza, who had examined Randy more than a month earlier, conducted the examination that day. As the court described it, Dr. Podraza's findings in his second evaluation were "strikingly different" from those of the March 28 assessment. Dr. Podraza described Randy as "alert, friendly, pleasant, and very cooperative." Randy informed Dr. Podraza that he was anxious to return to his home and planned to quit drinking although without therapy or group support. After conducting the examination, Dr. Podraza concluded that Randy had capacity to "manage simple or complex finances independently" and "make better informed decisions regarding his health." Dr. Podraza requested that a community case manager be referred to Randy as a condition of his release from EMMC.

[¶11] After Dr. Podraza's second neuropsychological evaluation, EMMC concluded that Randy no longer needed acute medical care and that the hospital was possibly holding him there against his will. Oliver and Jernigan, however, disputed Dr. Podraza's conclusion that Randy had regained capacity, opposed his discharge from the hospital to any setting other than a locked facility, and wanted a second opinion but were unable to find an evaluator not affiliated

6

with EMMC. Although EMMC offered to have Randy evaluated by an EMMC practitioner, Oliver and Jernigan ultimately informed EMMC that they did not want another evaluation.

[¶12] EMMC's vice president and in-house legal counsel initially concluded that EMMC could not discharge Randy without his guardians' consent. The attorney then reconsidered the issue after reviewing the Probate Court's guardianship order and, based on the provision of the order that limited the guardian's authority to make decisions for Randy only when Randy himself was not capable of doing so, recommended that EMMC could release Randy if and when he regained capacity.

[¶13] During this time, Randy's assigned social worker at EMMC assisted Randy with filling out a petition to terminate the guardianship and a motion for appointment of counsel, which included an indigency affidavit. Although Randy independently obtained information needed for the paperwork, it was never filed with the Probate Court.

[¶14] On May 16, a certified nurse practitioner at EMMC who was providing direct care to Randy assessed whether he should be discharged. Based on his own assessment and his review of Randy's medical record, including Dr. Podraza's opinion following his May 7 assessment, the certified

nurse practitioner concluded that Randy had sufficient capacity to manage his own affairs and decided to discharge him. The discharge plan included referrals to Randy's primary care provider, a pain clinic, and community case management, and a recommendation to participate in substance abuse treatment.

[¶15] That day, Randy's EMMC-based social worker left a message for Oliver informing him of EMMC's decision to discharge Randy and allow him to go home that day. The social worker also called and spoke directly with Jernigan, who, again, told him that neither she nor Oliver had authorized Randy's discharge. The social worker offered to arrange for a taxi to take Randy to her residence, but Jernigan declined that offer.

[¶16] EMMC went forward with its plan to discharge Randy, and he left the hospital that day with a friend. Jernigan and Patricia visited Randy at his home twice that night. When they left Randy for the final time at around 9:00 p.m., he was intoxicated. Randy died later that night as the result of a fire that destroyed his entire home.

## II. PROCEDURAL BACKGROUND

[¶17] Oliver and Jernigan, individually and as representatives of Randy's Estate, filed a complaint, later amended, against EMMC in the Superior Court in

late 2014.  Although in its final form the complaint contained a number of counts, each of them was predicated on a claim of negligence except for a count alleging intentional infliction of emotional distress.[2]  The court (*A. Murray, J.*) held a five-day bench trial in June of 2016.  In a judgment entered on August 8, 2016, in which the court set out extensive findings of fact and a thorough legal analysis, the court concluded that EMMC was not negligent when it discharged Randy over the objection of his guardians and that the discharge plan met the standard of care.  On all counts of the amended complaint, the court therefore entered judgment for EMMC.

[¶18]  On August 15, EMMC filed a bill of costs, *see* 14 M.R.S. §§ 1501 to 1502-C (2017), which included expert witness fees and expenses from the prelitigation screening panel hearing, *see* 24 M.R.S. § 2854 (2017).  On August 22, Oliver and Jernigan filed a consolidated motion for amended or additional findings, for modification of the judgment, and for a new trial.  *See* M.R. Civ. P. 52, 59.  On September 20, the court denied their motion.  After the parties filed additional argument on costs, on November 18 the court entered

---

[2]  The liability claims comprised a survival action based on EMMC's alleged negligence, *see* 18-A M.R.S. § 3-817 (2017); negligence-based wrongful death claims for damages to the beneficiaries of Randy's estate and for Randy's conscious pain and suffering, *see* 18-A M.R.S. § 2-804 (2017); and claims for negligent and intentional infliction of emotional distress.

an order awarding some costs to EMMC but not those associated with the screening panel process.

[¶19]  EMMC filed a notice of appeal on December 2, 2016.  *See* M.R. App. P. 2(b)(3) (Tower 2016).[3]  On December 8, Oliver and Jernigan filed a cross-appeal and, in the alternative, a motion to enlarge the time in which to file the notice of appeal, claiming they had not received notice of the order denying their August 22 motion because the clerk had not sent the order to their attorney.  Without determining whether Oliver and Jernigan's appeal was timely, the court denied the motion to enlarge, and Oliver and Jernigan filed a separate notice of appeal from that order.[4]

## III.  DISCUSSION

[¶20]  The principal issues on appeal are Oliver and Jernigan's challenge to the court's conclusion that EMMC was not negligent and EMMC's challenge to the court's denial of some of its costs.  Before considering those contentions, we address the question of whether the notices of appeal were filed in a timely way.

---

[3]  This appeal was filed before September 1, 2017; therefore, the restyled Maine Rules of Appellate Procedure do not apply.  *See* M.R. App. P. 1 (restyled Rules).

[4]  Because three notices of appeal were filed, we issued an order consolidating the appeals and designating the Estate of Randy N. Oliver (i.e., Oliver and Jernigan) as the appellant.

10

A.     Timeliness of Appeal

[¶21]  Because EMMC and Jernigan and Oliver filed their notices of appeal more than twenty-one days after the entry of judgment, we must consider whether the notices were timely.

[¶22]  To be timely, a notice of appeal must be filed within twenty-one days after the judgment is entered in the docket, absent exceptions that are not present here.  *See* M.R. App. P. 2(b)(3) (Tower 2016).  Here, the judgment on the merits of the complaint was entered on August 8, 2016.  EMMC then filed a timely bill of costs on August 15, and the court entered an order allowing some costs and denying others on November 18.  On December 2—a date within twenty-one days after the entry of the court's order on costs—EMMC filed its notice of appeal.

[¶23]  In a case where there are several trial court judgments or other dispositive orders, we will "review each to determine at what point the court fully decided and disposed of the whole matter leaving nothing further for the consideration and judgment of the trial court."  *Coastal Ventures v. Alsham Plaza, LLC*, 2010 ME 63, ¶ 18, 1 A.3d 416 (alterations omitted) (quotation marks omitted); *see also E. Perry Iron & Metal Co. v. City of Portland*, 2006 ME 52, ¶ 5, 896 A.2d 956.  Here, at least as to EMMC, the judgment did not become final

until November 18, when the court resolved the request for an award of costs. Until the court issued that order, there was nothing on which EMMC could present the challenge it pursues here, namely, its contention that the court erred by denying an award of some of the costs it sought to recover from Jernigan and Oliver. EMMC's notice of appeal, filed within twenty-one days after the court's order on costs, was therefore timely.

[¶24] Jernigan and Oliver then filed a cross-appeal on December 8—six days after EMMC filed its notice of appeal. If one party files a timely notice of appeal, any other party is entitled to file a notice of appeal within fourteen days after the first notice of appeal is filed. M.R. App. P. 2(b)(3) (Tower 2016). The notice of appeal filed by Jernigan and Oliver therefore was timely because the deadline for their appeal is measured by the date of EMMC's appeal and not the date when the judgment was entered.[5]

[¶25] EMMC argues that any issues on appeal are limited to the November 18 order on costs because the time to appeal as calculated from August 8—the date when the judgment was entered—had long passed by December 8. The Maine Rules of Appellate Procedure state, however, that "[a]n

---

[5] Because Oliver and Jernigan's cross-appeal was timely, we need not address their related due process argument or their assertion that the court abused its discretion by denying their motion to enlarge the time to file an appeal.

12

appeal from a judgment, whenever taken, preserves for review *any claim of error* in the record."  M.R. App. P. 2(b)(4) (Tower 2016) (emphasis added). Jernigan and Oliver are therefore permitted to pursue their challenge to the judgment on its merits.

B.      Oliver and Jernigan's Claims against EMMC

[¶26]  Oliver and Jernigan assert that, by rejecting their claim against EMMC, the court erred in several respects: by concluding that the Probate Court's guardianship order did not preclude EMMC from discharging Randy, given the contrary instructions they had given in their capacity as Randy's court-appointed guardians; by concluding that Randy had regained capacity to make the decision to be discharged; and by concluding that EMMC's discharge plan was reasonable.  We first review the statutory framework applicable to guardianships in these circumstances and then consider the strands of Oliver and Jernigan's argument in turn.

1.      Guardianship Statutes

[¶27]  "We review issues of law de novo."  *Levesque v. Cent. Me. Med. Ctr.*, 2012 ME 109, ¶ 16, 52 A.3d 933.  Specifically, when considering issues of statutory interpretation, we will "examine the entirety of the statute, giving due weight to design, structure, and purpose as well as to aggregate language."

*Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 22, 107 A.3d 621 (quotation marks omitted).

[¶28]  The Probate Code authorizes the court to appoint a guardian for an incapacitated person.[6]  *See* 18-A M.R.S. §§ 5-303, 5-304 (2017).  The appointment of a guardian affects the incapacitated person's personal liberties. *See Guardianship of Collier*, 653 A.2d 898, 900 (Me. 1995).  Consequently, when entering a guardianship order, the court is required to exercise its appointment authority in a way that "encourage[s] the development of maximum self reliance and independence of the incapacitated person and make[s] appointive and other orders only to the extent necessitated by the incapacitated person's actual mental and adaptive limitations or other conditions warranting the procedure."  18-A M.R.S. § 5-304(a).  To implement this objective, in appropriate circumstances a court may—as the Probate Court did here— appoint a limited guardian, which is a category of guardians "established to assure flexibility in dealing with special circumstances."  *In re James John L.*,

---

[6] The Probate Code defines "incapacitated person" as "any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, *chronic intoxication*, or other cause except minority to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person."  18-A M.R.S. § 5-101(1) (2017) (emphasis added).

14

601 A.2d 630, 631 (Me. 1992) (quotation marks omitted); *see* 18-A M.R.S.

§ 5-105 (2017). Section 5-105 provides:

> In any case in which a guardian can be appointed by the court, the judge may appoint a limited guardian with fewer than all of the legal powers and duties of a guardian. The specific duties and powers of a limited guardian shall be enumerated in the decree or court order. A person for whom a limited guardian has been appointed retains all legal and civil rights except those which have been suspended by the decree or order.[7]

[¶29] Pursuant to the Probate Code, when a guardian's authority extends

to health-care decisions, the guardian may "give or withhold consents or

approvals related to medical or other professional care . . . for the ward."

18-A M.R.S. § 5-312(a)(3) (2017). In doing so, however, the guardian must

"make a health-care decision in accordance with the ward's individual

---

[7] The Probate Court's order imposed limitations on the guardian's authority and cited to 18-A M.R.S. § 5-105 (2017), which is the statutory authority for a court to create a limited guardianship. From this, it is apparent that the Probate Court intended the guardianship to be limited. As noted in the text, section 5-105 requires the court, when creating a limited guardianship, to "enumerate[]" the "specific duties and powers" of the limited guardian. The order here did not do so. Rather than affirmatively and specifically delineating the guardians' duties and powers created by the order, it stated in a non-specific way that the guardians would have "custody" of Randy and "all other duties of a Guardian under law." This stands in contrast to the provisions of 18-A M.R.S. § 5-312 (2017), which lists, in specific terms, the powers and duties that a court may grant to a guardian. The order here then purports only to set two *limitations* on the non-specific grant of authority to the guardians, namely, that the guardians were entitled to "act only as necessitated by [Randy's] actual mental and adaptive limitations or other conditions warranting this procedure" and that the guardians were to assure that Randy's right to vote was "honor[ed]."

Oliver and Jernigan and EMMC have not challenged the validity of the guardianship order as measured by the requirements of section 5-105—something that is understandable given that much of their argument to the court and on this appeal is predicated on that order. We therefore assume, without deciding, that the structure of the Probate Court's guardianship order meets the requirements of section 5-105.

instructions, if any, and other wishes expressed while the ward had capacity."

*Id*.

[¶30]  The Probate Code contains the Uniform Health-Care Decisions Act (UHDA) as adopted in Maine, *see* 18-A M.R.S. §§ 5-801 to 5-818 (2017), which outlines the obligations of a health-care provider with regard to a patient's health-care decisions, including where a guardian has been appointed for the patient.  *See id*. § 5-807.  A person is presumed to have "capacity" to make health-care decisions.  *Id*. § 5-811(b).  "Capacity" is defined statutorily as "the ability to have a basic understanding of the diagnosed condition and to understand the significant benefits, risks and alternatives to the proposed health care and the consequences of foregoing the proposed treatment, the ability to make and communicate a health care decision and the ability to understand the consequences of designating an agent or surrogate to make health-care decisions."  *Id.* § 5-801(c).  The statutory presumption of capacity "may be rebutted by a determination by the individual's primary physician or by a court of competent jurisdiction."  *Id*. § 5-811(b).  A primary physician[8] who

---

[8]  "'Primary physician' means a physician designated by an individual with capacity or by the individual's agent, guardian or surrogate, to have primary responsibility for the individual's health care or, in the absence of a designation or if the designated physician is not reasonably available, a physician who undertakes the responsibility."  18-A M.R.S. § 5-801(m) (2017).

makes or is informed of a determination that a patient has regained capacity must "promptly record the determination in the patient's health-care record and communicate the determination to the patient, if possible, and to any person then authorized to make health-care decisions for the patient." *Id.* § 5-807(c). When a person is authorized to make health-care decisions for the patient, the provider is required to comply with the decision made by the surrogate "to the same extent as if the decision had been made by the patient while having capacity." *Id.* § 5-807(d)(2).

2. Effect of the Guardianship Order

[¶31] The letters of guardianship appointing Oliver and Jernigan as guardians for Randy stated, "Unless limitations appear above, [Jernigan and Oliver] shall have custody of [Randy] and all other duties of a Guardian under law until further order of this Court or until [Randy's] need for a guardian is otherwise terminated." This grant of authority, however, was made subject to a condition that Oliver and Jernigan "act only as necessitated by [Randy's] actual mental and adaptive limitations or other conditions warranting this procedure." Oliver and Jernigan assert that this language in the order did not limit their authority to make health-care decisions while the order remained in

effect and that the order barred EMMC from acting on Randy's own decision to leave the hospital. We disagree.

[¶32] The limiting language contained in the guardianship order is derived from section 5-304(a). That statute is directed to *the court's* exercise of authority in setting the terms of the guardianship in a way that does not interfere excessively with the ward's autonomy. Here, however, the court chose to use that limiting language to define the scope of *the guardians'* authority to act on Randy's behalf. Although Oliver and Jernigan seek to diminish the significance of that limitation by characterizing it as a boilerplate provision of the order, the words chosen by the court have effect and must be given their plain meaning, *see Burnell v. Burnell*, 2012 ME 24, ¶ 15, 40 A.3d 390. And as the clear terms of that provision establish, Oliver and Jernigan—as guardians—were authorized to make health-care decisions for Randy "*only* to the extent *necessitated* by [Randy's] actual mental and adaptive limitations." (Emphases added.) This language is more than precatory. Rather, set in concrete terms, the order circumscribed the scope of the guardians' authority and the circumstances in which they had authority to make decisions for Randy.

[¶33] Therefore, the court did not err by determining that the Probate Court's guardianship order did not, as a matter of *law*, preclude EMMC from

acting on Randy's wish to be discharged from in-patient hospitalization. The next question is whether, as a matter of *fact*, Randy had regained capacity that would activate the limitation in the guardianship order, thereby stripping the guardians of their authority—while Randy had capacity—to make health-care decisions for him and correspondingly allowing him to make his own decisions.[9]

### 3. Discharge Decision

[¶34] We "conduct a deferential review [of findings of fact] for clear error." *Zablotny v. State Bd. of Nursing*, 2017 ME 29, ¶ 18, 156 A.3d 126. "A finding of fact is clearly erroneous if there is no competent evidence in the record to support it; if the fact-finder clearly misapprehends the meaning of the evidence; or if the finding is so contrary to the credible evidence that it does not represent the truth and right of the case." *Young v. Lagasse*, 2016 ME 96, ¶ 8, 143 A.3d 131 (quotation marks omitted).

[¶35] Here, the court found that Randy had regained capacity by May 16. Although the evidence on that issue was disputed, the record fully supports the

---

[9] Oliver and Jernigan mistakenly equate the effect of Randy's recovery of capacity with a termination of the guardianship order altogether, which would be controlled by 18-A M.R.S. §§ 5-306 and 5-307 (2017). The guardianship order remained in effect even though Randy regained capacity; the guardians' authority was merely suspended to the extent that their intervention was not "necessitated by [Randy's] actual mental and adaptive limitations."

court's ultimate and closely analyzed determination. *See Gordon v. Cheskin*, 2013 ME 113, ¶ 12, 82 A.3d 1221 ("We defer to the trial court's determination of witnesses' credibility and its resolution of conflicts in testimony."). A number of EMMC providers who interacted with Randy during his hospitalization reached that conclusion and testified to the reasons they determined that Randy had capacity. For example, based on the evaluation conducted on May 7, Dr. Podraza—who had the benefit of having assessed Randy more than a month earlier and in fact was assigned to conduct the May 7 evaluation for that reason, and whose evaluation, according to expert witnesses called by EMMC, met the standard of care—concluded that Randy had regained capacity. The court also credited the testimony and conclusion reached by the certified nurse practitioner, who was providing direct care for Randy during the last few days of Randy's admission and determined that Randy had "sufficient insight and judgment to manage his person."

[¶36] As the court also noted, Randy's hospital records showed that his behavior and engagement with others in the hospital setting showed significant improvement—he had become fully oriented, his physical condition had improved, he was eating and sleeping well, he was engaged in an exercise program, and he was attending to his hygiene. Randy's planning and behavior

leading up to and immediately following the discharge—for example, arranging for a ride from a friend rather than from family members who might be expected to interfere with his discharge, and going to a store to purchase specific items he needed—are indicative of capacity. Further, two expert witnesses—a psychiatrist and a neuropsychologist—explained that Randy had capacity to be discharged. The court's finding that Randy had capacity as of May 16 is well supported by the evidence and not clearly erroneous.

[¶37] Oliver and Jernigan assert that the Probate Court's determination, which was a predicate to the guardianship order, that Randy had "capacity conditions which warrant an appointment of a guardian" barred both EMMC and, later, the court from concluding differently. This contention is undermined by the very terms of the guardianship order, which framed the guardians' authority as a function of Randy's "*actual* mental and adaptive limitations or other conditions warranting this procedure." (Emphasis added.) The order signals an expectation, not of stasis, but of a dynamic situation where changes in Randy's condition—his "actual" level of capacity—would define the nature and extent of the guardians' authority. This would necessarily call for an ongoing assessment of Randy's capacity, which is what both EMMC and the court properly did.

[¶38]  For these reasons, the court did not err by concluding that EMMC properly complied with the directive made by Randy—a patient with capacity—that he be discharged.[10]

4.      Adequacy of Discharge Plan

[¶39]  Finally, the parties do not dispute that EMMC was required to provide Randy with a safe and reasonable discharge plan.  The court thoroughly analyzed the evidence on this issue, including expert testimony and evidence of the events leading up to Randy's discharge.  On that basis, not only did the court conclude that Oliver and Jernigan did not prove that the discharge plan was deficient, but the court found affirmatively that the discharge plan was reasonable.

[¶40]  The discharge plan included an appointment, made by EMMC, at a pain clinic;[11] an appointment, also made by EMMC, for Randy to see his primary care physician four days after discharge; and contact information given to Randy for case management services.  The discharge plan also included a strong

---

[10]  Once Randy's primary physician made or learned of a determination that Randy had capacity, the provider was required to record that determination in Randy's health-care record and notify any person who was authorized to make health-care decisions for Randy.  *See* 18-A M.R.S. § 5-807(c) (2017).  The court did not make specific findings on this issue, but the record contains evidence that EMMC complied with this statutory requirement, and Oliver and Jernigan do not raise a challenge based on this provision.

[11]  The record contains evidence that Randy had suffered a back injury that caused him pain.

recommendation to Randy that he stop drinking and attend group meetings, and EMMC offered substance abuse counseling. By the time he was discharged, Randy had come to admit that he was an alcoholic and stated that he would try to stop drinking although without substance abuse counseling or attendance at group meetings. The court found that this acknowledgement showed insight and significant progress and that, because Randy was medically stable and had capacity when he was discharged, EMMC was obligated to comply with his wish to leave, notwithstanding the prospect that he would resume drinking—a decision Randy was entitled to make.

[¶41] Before he was discharged, Randy's nurse reviewed the discharge plan with him, and he indicated that he understood. Finally, the social worker working with Randy at the time of the discharge notified Jernigan that Randy was about to be released. The court considered the relatively short amount of notice provided to Jernigan but concluded, without error, that EMMC was required to act on Randy's insistence to leave the hospital.

[¶42] The court did not commit clear error by concluding that EMMC provided Randy with a safe and reasonable discharge and was not negligent in discharging him.

C.    EMMC's Bill of Costs

[¶43]   We turn finally to EMMC's assertion that the court erred by denying its bill of costs for expert witness fees and expenses incurred during the mandatory prelitigation panel proceedings held pursuant to 24 M.R.S. §§ 2851-2859 (2017).  "We review issues of law de novo," *Levesque*, 2012 ME 109, ¶ 16, 52 A.3d 933, but review "the decision of the court to award costs for an abuse of discretion," *Poland v. Webb*, 1998 ME 104, ¶ 12, 711 A.2d 1278.

[¶44]  Maine Rule of Civil Procedure 54(d) provides that "[c]osts shall be allowed as of course to the prevailing party, as provided by statute and by these rules, unless the court otherwise specifically directs."   Courts have the discretion to award reasonable expert witness fees and expenses as allowed pursuant to title 16, section 251.  *See* 14 M.R.S. § 1502-C(1).  Section 251, in turn, gives the court discretion to "allow at the *trial* of any cause, civil or criminal, in the Supreme Judicial Court, the Superior Court or the District Court, a reasonable sum for each day's attendance of any expert witness or witnesses *at the trial*." 16 M.R.S. § 251 (2017) (emphasis added); *see Webb*, 1998 ME 104, ¶ 14, 711 A.2d 1278 ("Those statutory provisions [14 M.R.S. § 1502-C and 16 M.R.S. § 251] authorize only fees that are directly related to attendance at trial.").   The question here is whether a prelitigation screening panel

proceeding held pursuant to 24 M.R.S. §§ 2851 to 2859 is a "trial" within the meaning of section 251.

[¶45] After a party files a notice of claim of medical malpractice, pursuant to the Maine Health Security Act, 24 M.R.S. § 2853, "a prelitigation screening panel must hear cases of alleged medical malpractice before a complaint is filed in court." *Hill v. Kwan*, 2009 ME 4, ¶ 2, 962 A.2d 963; *see* 24 M.R.S. §§ 2851-2859, 2903 (2017). That proceeding is not the trial, however, but rather is a device intended to "encourage early resolution of [meritorious] claims *prior to commencement of a lawsuit.*" 24 M.R.S. § 2851(1)(A) (emphasis added); *see also Gafner v. Down E. Cmty. Hosp.*, 1999 ME 130, ¶ 22, 735 A.2d 969 ("The panel screening process is intended to be . . . an independent mechanism for the initial *screening* of claims of professional negligence." (emphasis added)). "Although the screening panel is an agency of the courts, it cannot be considered an inferior court or quasi-judicial tribunal . . . ." *Sherburne v. Med. Malpractice Prelitigation Screening Panel*, 672 A.2d 596, 598 (Me. 1996); *see also Hill*, 2009 ME 4, ¶ 12, 962 A.2d 963 ("The screening panel has no independent judicial authority—it cannot enter a final judgment, and its decisions have no precedential value.").

[¶46]   For that reason, although a prelitigation screening panel proceeding is adversarial and provides a forum for the parties to present the merits of their cases, the panel process is not a "trial," which is the event that triggers the court's authority to award expert witness fees and expenses pursuant to section 251.  The court therefore did not err by denying EMMC's request for an award of expert witness costs generated by the prelitigation panel proceeding.

## IV.  CONCLUSION

[¶47]   In summary, the court did not err by determining that EMMC's decision to discharge Randy from inpatient treatment was supported by the law and the facts.  Further, the court properly denied EMMC's request for an award of costs for expert witness fees and expenses incurred during the statutory panel proceeding.

The entry is:

Judgment affirmed.

_____

Peter Clifford, Esq. (orally), and Andrew P. Cotter, Esq., Clifford & Clifford, LLC, Kennebunk, for appellants Randy N. Oliver, II and Nicole Jernigan

Edward W. Gould, Esq. (orally), Sandra L. Rothera, Esq., and Mariann Z. Malay, Esq., Gross, Minsky & Mogul, P.A., Bangor, for appellee Eastern Maine Medical Center

Penobscot County Superior Court docket number CV-2013-126
FOR CLERK REFERENCE ONLY