**STATE of Maine**

**v.**

**Eric REED.**

Supreme Judicial Court of Maine.

Submitted on Briefs Feb. 21, 1996.

Decided May 7, 1996.

Andrew Ketterer, Attorney General, Linda Conti, Assistant Attorney General, Augusta, for State.

James R. Bushell, Portland, for Defendant.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, and DANA, JJ.

WATHEN, Chief Justice.

Defendant Eric Reed appeals from a judgment of the Superior Court (Cumberland County, *Cole, J.*) convicting him of the crime of manslaughter. On appeal he argues that the court erred in denying his motion to dismiss a murder indictment on the grounds that the State could not establish the *corpus delicti* of the crime of homicide. Finding no error, we affirm the judgment.

The unusual procedural posture of the present case may be summarized as follows: The grand jury indicted defendant Eric Reed for murder in connection with the October 29, 1989 death of his seven-month old son, Alexander McKenney. In apparent recognition of the fact that the State's case rested heavily, if not exclusively, on defendant's confession to the police in June of 1993, defendant moved to dismiss the indictment for the State's inability to establish the *corpus delicti* of the crime of homicide. The State

agreed to a hearing on the *corpus delicti* issue prior to the trial.

The facts presented at the hearing may be summarized as follows: Alexander McKenney was the infant child of defendant Eric Reed and his former girlfriend, Delia McKenney Maddox. Maddox had primary custody of Alexander. Defendant and Maddox fought constantly over Alexander's custody: he wanted to see his son more often, and did not approve of her parenting style. Defendant once said to her that if he couldn't have Alexander, no one would.

Maddox would sometimes leave Alexander with defendant's mother, Mrs. Searles. On the weekend of October 28, 1989, Mrs. Searles and her husband were taking care of Alexander, and defendant came to stay with them for the weekend. Alexander was recovering from a respiratory infection; apart from this fact, he was generally a healthy, well-developed child.

At around 2:00 a.m. on Sunday, October 29, defendant woke his mother by pounding on her bedroom door, yelling that the baby wasn't breathing. Mrs. Searles ran into the room where defendant and Alexander had been sleeping. Their bed was located in the corner, against a wall. The baby was lying in the middle of the bed, which was unusual: he usually slept close to the wall, and defendant would sleep on the outside to keep him from rolling off. The baby was lying on his back, which was also unusual: Alexander did not like to sleep on his back, and was able to roll himself over. Alexander did not sleep with a pillow. Because the house was drafty, the family often placed pillows against the wall to keep out the draft and to keep the baby from getting his hand caught in the gap. There were two pillows on the bed, but they were not against the wall or near the baby, rather, they were at the head of the bed.

Alexander wasn't breathing. Mrs. Searles started to perform CPR, and defendant called "911". Mrs. Searles testified that the baby was pale, but not blue, and that his lips and fingernails were not blue, either. The first police officer to arrive, Officer Desjardins, testified that the baby was blue. The family and Officer Desjardins followed the ambulance to the hospital. While the emergency room staff was treating Alexander, Officer Desjardins and Mrs. Searles left the hospital and returned to the apartment.

The officer inspected the bedroom. The officer examined the pillows which had been at the head of the bed. He turned over one pillow and saw it had a four- to five-inch wet spot on the side that had been face down. In the middle of the wet spot he observed a substance that appeared to be mucous. He put the pillow down and returned to the hospital. At the hospital, the officer told defendant he had seen the pillow with mucous on it and wanted to collect it for a more thorough exam.

The doctor came out and announced to all that Alexander had died. Officer Desjardins stayed to comfort the distraught grandparents. Defendant said he needed to take a walk and left. Officer Desjardins received permission from Mrs. Searles to search the apartment and seize the pillow; he then called ahead for another officer to keep an eye on the apartment. When Officer Desjardins returned to the apartment, the first officer was already there and defendant was sitting on the couch smoking a cigarette. Officer Desjardins retrieved the pillow.

An autopsy was performed on Alexander. Officer Desjardins attended the autopsy and specifically informed the medical examiner that he believed the child had been smothered. Because the examiner was unable to determine the cause of death, he listed the cause of death as Sudden Infant Death Syndrome (SIDS). He testified that SIDS has become a conventional finding as a 'cause' of death although it really means there is no known cause, whether natural or unnatural; it is synonymous with "undetermined."

The examiner then explained that the fact that SIDS was the 'cause' of death does not mean the death was not the result of a homicide. For example, a child can be smothered, and this may, or may not, show up in the autopsy. Sometimes when a baby is smothered, there are small hemorrhages around the eyes as a result, but not always. The examiner testified that he specifically looked for these signs, and Alexander did not

have these types of hemorrhages. He explained that a child who dies of smothering may also show signs of lividity (blue face) or cyanosis (blue color in the lips and fingernails and the overall skin tone). If there is no constriction in the neck, however, the face may not become livid. Similarly, if the child is on his back, the blood will react to gravity and not necessarily show cyanosis; rather, the child will simply be pale with no color at all.

The court denied defendant's motion, applying a "probable cause" standard of proof and determining that the State had satisfied its burden:

> The location of the baby on the defendant's bed, the fact that he was face up with mucus discharge in his nose area and the location of the wet pillow case placed at the head of the bed face down strongly suggests that someone placed that pillow over the baby's face area for a sufficient period of time to cause a wet area to appear with an apparent mucus discharge in the center of the wet area. The baby could not have moved the pillow from his location to the head of the bed, nor could he have placed it face down.

> The unexplained death of a normal, healthy baby who clearly had a pillow placed over his face clearly suggests that he was asphyxiated and that his death was a homicide.

> The defendant's prior threat to the baby's mother [and] his suspicious behavior in returning to the scene of the crime ... is also relevant evidence on the *corpus delicti* issue.

Thereafter, pursuant to a plea agreement, the State dismissed the indictment for murder and defendant entered a conditional guilty plea to an information charging him with manslaughter. Defendant now appeals the denial of his motion to dismiss the indictment.

■ Defendant argues that SIDS is a term referring to a death caused by unknown, but presumed natural, causes. Therefore, the examiner's entry of SIDS as cause of death suggests the death was not a result of homicide. Defendant points out

that the examiner, fully aware of Officer Desjardin's suspicions, was on the lookout for any signs of asphyxiation, yet found none. Defendant argues that the other evidence relied on—the wet spot, the location of the pillow, and the baby's position on his back—is insufficient to comply with the requirements of the *corpus delicti* rule.

■ We have previously noted that there are two prongs to the State's substantive burden of proving the *corpus delicti*. *See State v. Curlew*, 459 A.2d 160, 164 (Me. 1983). In the case at bar, we are dealing with the initial hurdle that the State must clear before the court may rely on the defendant's extrajudicial confessions or admissions. In a case charging the defendant with homicide, the State must establish, with facts independent of the defendant's statements, "(1), the fact of death of the victim; and (2) the criminal agency of another responsible for that death." *State v. Anderson*, 409 A.2d 1290, 1300 (Me.1979). This rule, precluding the use of a defendant's confession alone to convict him of a crime, was developed to prevent a conviction when no crime has in fact occurred. *State v. Davis*, 374 A.2d 322, 323 (Me.1977).

■ To satisfy this initial burden, the State must "produce ... sufficient credible evidence exclusive of any admission or confession of the defendant as will 'create a substantial belief that the crime [charged] has been committed by some person.'" *State v. Spearin*, 477 A.2d 1147, 1151 (Me. 1984), citing *State v. Curlew*, 459 A.2d 160, 164–65 (Me.1983). This 'substantial belief' is not 'beyond a reasonable doubt'. It is not even to the level of a 'fair preponderance of the evidence'; rather, the degree of proof required "resembles the probable cause standard." *Id.* In the context of the *corpus delicti* rule, "[p]robable cause exists where facts and circumstances within the knowledge of the [fact finder] ... would warrant a prudent and cautious person to believe" that the crime was committed by someone. *State v. Enggass*, 571 A.2d 823, 825 (Me.1990) (articulating the meaning of probable cause to arrest a defendant). This standard is objective, not subjective. *Id.*

In making this inquiry, the court's findings of fact will not be disturbed unless clearly erroneous. Whether the facts as found by the trial court are sufficient to establish "probable cause" to believe that a crime has been committed by someone is a question of law, however, and will be reviewed *de novo.* In the present case, the court's findings of fact are adequately supported in the record. Those facts, objectively viewed, are sufficient to establish a substantial belief that the infant died as the result of a criminal agency. The existence of other explanations for the circumstances surrounding Alexander's death does not preclude such a finding. Having found probable cause to believe that Alexander was murdered, the court did not err in declining to dismiss the indictment.

The entry is:

Judgment affirmed.

All concurring.