STATE OF MAINE
CUMBERLAND, ss.

UNIFIED CRIMINAL DOCKET
No. CR-17-1909

STATE OF MAINE

v.                                                                    ORDER

BURTON HAGAR,

        Defendant

Before the court is a pretrial motion to dismiss the indictment against defendant Burton Hagar based on what the defense contends is the State's inability to establish the corpus delicti of a crime of homicide.

While ordinarily a corpus delicti issue would not be the subject of a pretrial motion, the unusual procedure employed in this case results from a contingent plea agreement between counsel for the State and Hagar, under which the parties have agreed to resolve the case with a manslaughter plea and a specified sentence in the event that Hagar does not prevail on his corpus delicti argument either before this court or on appeal.[1] Pursuant to the terms of the contingent plea agreement, Hagar has reserved his ability to pursue his corpus delicti challenge and the State has allowed the issue to be litigated at a pretrial hearing and, if the trial court's ruling is adverse to Hagar, to be appealed after a conditional plea. This is a similar procedure to the one employed, also with the State's agreement, in *State v. Reed*, 676 A.2d 479 (Me. 1996).

---

[1] The details of the contingent plea agreement were set forth on the record at the beginning of the hearing on April 10, 2018. In his original motion filed in July 2017, Hagar also raised a due process argument based on pre-indictment delay. He has since clarified that under the plea agreement, he has withdrawn that argument.

Entered on the Docket: 7-11-18

A hearing on the corpus delicti issue was held on April 10, 2018. The parties thereafter filed memoranda of law, and the court has now reviewed the arguments of the parties and the evidence submitted at the hearing.

Corpus Delicti

The corpus delicti doctrine requires the State to present evidence, independent of incriminating statements made by an accused, sufficient to create a substantial belief that the crime alleged was committed by somebody. *State v. Poulin*, 2016 ME 40 ¶ 8, 134 A.3d 886. The purpose of the rule is to prevent convictions based solely on inculpatory statements and convictions when no crime has actually occurred. *Id.*

The Law Court has stated that the quantum of evidence that the State must present to meet the corpus delicti standard is "low." *Poulin,* 2016 ME 40 ¶ 12, quoting *State v. Fundalewicz,* 2012 ME 107 ¶ 9, 49 A.3d 1277. Specifically, the corpus delicti standard is akin to the probable cause standard and can be satisfied by "less than a preponderance of the evidence." *Poulin,* 2016 ME 40 ¶ 12; *Fundalewicz,* 2012 ME 107 ¶ 9; *State v. Snow*, 438 A.2d 485, 487 (Me. 1981) (quotations omitted). A finding that the corpus delicti standard has been met can be based on circumstantial evidence and reasonable inference. *Fundalewicz,* 2012 ME 107 ¶ 11. Moreover, corpus delicti findings are preliminary determinations that do not necessarily need to be based on admissible evidence. M.R.Evid. 101(b)(1), 104(a); *Poulin,* 2016 ME 40 ¶ 10; *Snow,* 438 A.2d at 487.

The corpus delicti rule has been criticized as inadequate (because it does not protect against false confessions to crimes that can be proven to have taken place), as unnecessary (in light of other protections against false confessions), and because it has a potential to obstruct

2

justice in cases involving very young victims – where children are too young to testify or where causes of injury or death cannot be determined. *See, e.g., People v. LaRosa*, 2012 CO 2 ¶¶ 25-27, 293 P.3d 567 (Colo. 2013); *State v. Mauchley*, 2003 UT 10 ¶¶ 21- 46, 67 P.3d 477 (Utah 2003).

Moreover, the U.S. Supreme Court and the federal courts do not follow the traditional corpus delicti rule but instead examine whether there is sufficient evidence that an accused's confessions or other inculpatory statements are "trustworthy." *United States v. Smith*, 348 U.S. 147, 156 (1954); *Opper v. United States*, 348 U.S. 84, 93 (1954).[2] It appears that more than 15 states have abandoned the traditional corpus delicti rule and have adopted the federal trustworthiness rule, at least in certain cases. *See State v. Dern*, 362 P. 3d 566, 580 (Kan. 2015). By way of example, Kansas has adopted the trustworthiness rule with respect to "crimes that do not naturally and obviously produce a tangible injury easily susceptible to physical proof." *State v. Dern*, 362 P.3d at 583.

In this case, as discussed below, whether a crime was committed cannot be resolved by medical evidence – whether on May 9, 1979 four-month old Nathan Hagar died of SIDS (sudden infant death syndrome) or was smothered. This case therefore is in the category of an alleged crime that does not naturally and obviously produce a tangible injury susceptible to physical proof. However, the State is not arguing that it cannot meet the corpus delicti standard unless the federal trustworthiness standard is substituted in its place. Rather the State contends that there is sufficient evidence in this case – apart from Burton Hagar's numerous confessions beginning approximately 10 years after Nathan's death – to defeat Hagar's motion to dismiss.

---

[2] The corpus delicti rule is a procedural rather than a constitutional rule. *Tash v. Roden*, 626 F.3d 15, 18-19 (1st Cir. 2010).

3

Facts Relating to Nathan's Death Independent of Burton Hagar's Confessions

Nathan Hagar was born on January 4, 1979 to 23-year old Burton Hagar and 17-year old Venus Hagar (now Venus Nappi). Nathan was several weeks early and was delivered by C-section due to fetal distress. He initially had low Apgar scores but after several months he was reported as smiling and cooing and "gaining well." There is no evidence that he had any unusual medical issues. In an interview on May 16, 1979 Venus Hagar stated that Nathan had not experienced any illnesses since his birth.

During the time after Nathan's birth the relationship between Venus and Burton (referred to by Venus as "Ben") had deteriorated to some extent. In her May 16, 1979 interview Venus described Burton as someone who needed a lot attention and someone who occasionally displayed a violent temper. He had once thrown a dog against the wall in a rage, resulting in broken bones, and had threatened to kill himself a few times, which Venus ascribed in part to his need for attention. However, he had never once struck Venus or the baby, and Venus thought he was happy with the baby.

Venus was the baby's primary caregiver. Nathan was still nursing, and Venus rarely left him alone with Ben, in part because Ben was not comfortable when the baby cried.

Medical records, probably based on statements of Venus Hagar, and a report written by Brunswick police officer Mark Phillips indicate that prior to May 9 Nathan had experienced diarrhea for several days and had vomited early that morning. At some point during the day Nathan had begun sweating, and Venus cooled him down with a damp washcloth. However, the reports also state that Nathan "was not really sick today – laughed & played etc.," and appeared

4

to be fine by the end of the day.[3] Nathan was not yet able to roll over although Venus thought he was almost at that stage.

Venus described May 9 as a typical day. Ben came home in the evening, had a beer, and watched TV. Around 9 pm Venus left the apartment for approximately 20-25 minutes to get some Kool-Aid from a friend who lived nearby. When she left, Nathan was awake and in the living room. When she returned, Nathan was no longer in the living room, and Ben said he had put Nathan to bed. There was one bedroom in the apartment which contained both Nathan's crib and the parents' bed. When she returned to the apartment, Venus did not go into the bedroom to check on Nathan.

About 10 minutes later Ben went into the bedroom and screamed. Venus went into the bedroom and found Ben standing beside Nathan's crib, apparently distraught. Venus recalls that when she entered the bedroom, Nathan was lying face up in his crib, not breathing. Nathan's face was gray.[4]

Venus immediately assumed it might be "crib death," but she frantically sought to get help, then attempted mouth to mouth resuscitation. When the paramedics arrived, they took over and then took the baby to the hospital. Venus went with them, but Ben did not go to the hospital.

At the hospital Nathan was pronounced dead, and his death was almost immediately ascribed to "Sudden Infant Death Syndrome."

---

[3] The medical examiner's report states that Venus had brought Nathan to the obstetrical ward of the hospital that day, and multiple observers thought the child was in good health but noted that no medical record of that visit has been located.

[4] In her May 16, 1979 interview Venus stated that she thought Ben had picked up Nathan, but she now only recalls seeing Nathan lying face up in his crib when she entered the bedroom. In her May 16, 1979 interview Venus appears to have assumed that Ben had previously picked up Nathan but did not actually observe that.

5

In keeping with what parents of infants were advised to do at the time, Venus always placed Nathan on his stomach in his crib.[5] She did not place any pillows, blankets, stuffed animals, or toys in the crib because she did not want anything in the crib which could cause Nathan to suffocate. Nathan had never had a seizure, and Venus had never observed any instance where Nathan had experienced difficulty breathing.

Mark Phillips, who was a police officer in Brunswick from 1977 to 1998, was one of the first persons who responded to the 911 call that was placed by Venus or a downstairs neighbor. Phillips recalls he was dispatched based on a "medical emergency – baby not breathing." When he entered the bedroom, he saw Nathan lying on his back in his crib. Phillips observed that there was also a pillow at the head of the crib. The bedroom appeared to be in order. There was no disarray that suggested there had been any argument or physical disturbance.

Before he left for the hospital, Phillips picked up the pillow that he saw in the crib and flipped it over. On the underside of the pillow Phillips observed a small wet area of mucus or other fluid, white or yellowish in color and approximately 2 inches in circumference.

Phillips then went to the hospital, where he recalls being informed in short order that the cause of death was SIDS. He believes that he met Brunswick Detective Kenneth Taylor at the hospital, and Detective Taylor took over the case from there.

Phillips wrote a brief report which did not mention his observation of mucus or fluid on the pillow. His report indicates that he knew Nathan had been sick earlier in the day, and he thought the mucus was consistent with the baby having been sick.

---

[5] As Dr. Greenwald testified, the medical profession subsequently began advising parents that it was safer for infants to be placed on their backs, but this did not become the prevailing wisdom until the 1990s.

Detective Taylor (now deceased) interviewed Venus Hagar conducted on May 16, 1979, a week after Nathan's death. His report of that interview is captioned "Nathan Hagar (Sudden Infant Death)."

On May 21 Taylor interviewed Burton Hagar. His report of that interview is also captioned "Nathan Hagar (Sudden Infant Death)." Hagar stated that he had put Nathan to bed while Venus was out and that Nathan was awake at that time and cried for a brief period. Hagar stated that he went into the bedroom perhaps 45 minutes later and Nathan did not look right and was bluish in color. Burton stated that as soon as he saw that, he screamed and Venus came in, saw Nathan, called for an ambulance, and attempted mouth to mouth resuscitation.

After Nathan's death an autopsy was performed on that showed no internal injuries and did not note any evidence of infection. All the findings were unremarkable. Both the Medical Examiner's report and a pathologist's report stated, "Findings consistent with Sudden Infant Death."

As Dr. Greenwald testified, "Sudden Infant Death Syndrome" (SIDS) is also referred to as "Sudden Unexplained Infant Death" (SUID). While the medical and autopsy reports are consistent with SIDS – where for an unknown reason an infant stops breathing – those reports are also consistent with asphyxiation resulting from intentional smothering. In most asphyxiation cases the post-mortem findings come from the struggling of the victim. However, there will often be no such findings when an infant is involved because an infant, not yet even able to roll over, would be unable to struggle. Accordingly, the absence of any medical findings suggestive of homicide are simply not determinative and indicate that Nathan could either have died from an unknown cause or from being smothered.

7

Dr. Greenwald noted that in this case Nathan's death was ascribed to SIDS immediately or almost immediately when he was brought to the hospital, before any autopsy was done and before any significant investigation. The approach now is different, and a protocol is now followed and an investigation conducted to rule out any other possible causes before placing an infant's death into the category of SIDS or SUID.

Burton Hagar's Subsequent Admissions

If corpus delicti is established, the subsequent admissions that the State would offer in evidence are the following:

In May 1991, 12 years after Nathan's death, Deborah Hagar, who was Burton Hagar's third wife (they were separated at the time), informed the police that Burton had confessed to her in 1988 that he had smothered Nathan with a pillow because he could not get Nathan to be quiet. Deborah had not believed him at the time but had since changed her mind. By the time she talked to the police, she informed them that Burton had told a number of other people, including his second wife (Susan), his two brothers, and two of the mental health counselors that he had been seeing.

Shortly after that, on May 16, 1991, Hagar was interviewed by State Police Detective Steven Holt. After receiving Miranda warnings, Hagar acknowledged he had killed Nathan ("I put a pillow over his face and smothered him"). He also confirmed that he had confessed to two of his mental health counselors, his two brothers, his ex-wife Susan, and his current wife Deborah.

Police reports of interviews, medical records, and other documents confirm that Hagar had told Dr. Scott Davidson, a psychologist, in 1990 that he had smothered Nathan and that he

8

had told Lonetta Wallace, a licensed clinical counselor, the same thing around that time. At the suggestion of Wallace, he had also told his brothers.

The complete record contains documents reflecting confessions by Hagar to five additional counselors during the period from 2005 to 2011 and to his current wife, Bettie Gallant. By Hagar's account, he has also confessed to at least two additional people – his ex-wife Nancy[6] and Nancy's daughter Kayla.

On January 25, 2017 Hagar was interviewed again by two State Police detectives. On this occasion, after another Miranda warning, they began asking about his initial interview in 1991 and he interrupted to say, "I smothered him with a pillow while she [Venus] was gone." He repeated that admission in another state police interview on March 10, 2017.

In those interviews and in most of his other reported confessions Hagar was very remorseful ("I've felt like such a monster for so long"), and several of the counselors' reports include entries to the effect that Hagar was overwhelmed with guilt. In his various statements Hagar indicated that he really did not know why he had killed Nathan, but he raised various possibilities – that he may have been angry because of the way he was brought up, that he may have been jealous of the baby, that he may have been trying in some way to get back at his father, that he may have felt trapped because of the baby, that his actions may have had something to do with a bipolar condition that was later diagnosed, or that he may have wanted to stop the baby crying.

On the last issue, perhaps the only significant discrepancy in Hagar's confessions is whether or not Nathan was crying when Hagar smothered him. In some of his statements to family members, Hagar said the baby was crying. On various other occasions – and in his state police interviews in May 1991 and January 2017 – Hagar stated that Nathan was not crying when

---

[6] Burton Hagar has been married five times and has had several children since Nathan's death in 1979.

he was smothered. In telling family members that Nathan was crying, it is likely that Hagar was trying to make his actions more palatable.

Some of the reports have notations, presumably based on statements by Hagar, that his actions were not premeditated. In some of his statements, however, he acknowledged that he had previously thought about smothering Nathan. Moreover, in an early report to Dr. Davidson and again in his March 2017 state police interview, he stated that he begun to smother Nathan on a prior occasion but had not followed through and had then resuscitated him.

There are some other minor discrepancies in Hagar's statements, but since he began confessing Hagar has been consistent that he took a pillow from his bed, that he smothered Nathan with it, and that he knew it was wrong. According to the court's calculations, Hagar has confessed on at least 16 occasions since the late 1980s, and in that time he has never deviated from his acknowledgement that he smothered Nathan when his son was four months old.

Findings

The court finds that the State has sufficiently established corpus delicti to be able to introduce Hagar's admissions at a trial. On the basis of the medical evidence, the court accepts Dr. Greenwald's testimony that Nathan's condition after death would be consistent with SIDS but would also be consistent with smothering. That underlines a difficulty with corpus delicti in cases where an infant may have been smothered but does not give rise to a substantial belief that a crime has been committed within the meaning of *State v. Poulin* and *State v. Fundalewicz*.

The court finds, however, that the testimony of Phillips is sufficient to establish a substantial belief that Nathan was smothered.[7] As noted in *Fundalewicz*, 2012 ME 107 ¶ 8, the

---

[7] There is other evidence that would not raise a sufficient belief but constitute warning signals that add weight to the corpus delicti finding: Hagar's occasional displays of violent temper, his need for attention,

10

State must present "sufficient credible evidence" to establish corpus delicti. The defense argues that Phillips's testimony was not credible, but the court finds otherwise. Specifically, the evidence demonstrates that Nathan's death was ascribed to SIDS almost immediately when he was declared dead at the hospital and that Phillips was so informed at that time. Because he had been promptly informed of the SIDS diagnosis and because he knew that Nathan had vomited early in the morning, the wet spot on the underside of the pillow did not arouse Phillips's suspicion. Phillips did not mention the wet spot in his report, but it appears likely that he was never pressed for further details because the immediate SIDS diagnosis was never questioned. The captioning of Detective Taylor's followup interviews with Burton and Venus Hagar as "Sudden Infant Death" is consistent with the Brunswick Police having adopted SIDS as the cause of death from the outset.

The court finds that the small wet area of mucus or other fluid on the underside of a pillow in Nathan's crib gives rise to a "substantial belief" within the meaning of *Poulin* and *Fundalewicz* that Nathan was smothered. In this context it is significant that (1) Venus testified that she did not place any pillows in the crib (so a pillow should not have been there) and (2) the wet area was on the underside of the pillow (which Nathan would not have been able to reach on his own).[8] Recognizing that a substantial belief for purposes of corpus delicti need not rise to the level of a preponderance of the evidence, *Poulin*, 2016 ME 40 ¶ 12; *Fundalewicz*, 2012 ME 107

---

his discomfort when the baby cried, the deterioration of his relationship with Venus, and his failure to go to the hospital.

[8] In Hagar's subsequent admissions he stated that after smothering Nathan with a pillow taken from Hagar's own bed, he returned the pillow to his bed. It is not clear that the court can consider arguably inconsistent statements in a defendant's subsequent admissions in determining whether the State has established corpus delicti given that the court is supposed to decide the corpus delicti issue based on evidence "independent of incriminating statements made by the accused." *Poulin*, 2016 ME 40 ¶ 8. In any event, the court does not find that this inconsistency is sufficient to detract from the substantial belief finding. If Hagar had just smothered his son and knew that Venus could return any minute, it is entirely possible that he would not accurately remember what he subsequently did with the pillow.

11

¶ 9, the court finds that the substantial belief standard has been met in this case. This is consistent with the ruling in *State v. Reed*, 676 A.2d at 481.

Finally, although the State is not relying on the federal trustworthiness standard, the court has reviewed all of Hagar's subsequent admissions and would conclude that Hagar's repeated, seemingly forthright, and unequivocal statements that he smothered Nathan with a pillow would meet the trustworthiness standard if that standard were to be applied in this case.

Defendant's motion to dismiss the indictment on the ground that the State cannot establish the corpus delicti of the crime of homicide is denied.

Dated: July 10, 2018

Thomas D. Warren
Justice, Superior Court