MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2019 ME 97
Docket:      Cum-18-369
Argued:      May 14, 2019
Decided:     June 18, 2019

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.

## STATE OF MAINE

v.

## BURTON B. HAGAR

GORMAN, J.

[¶1] *Corpus delicti*, which means "body of the crime," describes the legal concept that the occurrence of a crime must be established before a person can be convicted of committing that crime. *Corpus delicti*, Black's Law Dictionary (10th ed. 2014) (quotation marks omitted). In this case, Burton B. Hagar relies on that principle in his appeal from a judgment of conviction for manslaughter, 17-A M.R.S.A. § 203(1)(A) (Supp. 1978),[1] entered by the trial court (Cumberland County, *Warren, J.*) after a conditional guilty plea. Hagar argues that the State failed to provide sufficient evidence, independent of his multiple confessions, to establish *corpus delicti* for the alleged homicide of his

---

[1] Title 17-A M.R.S.A. § 203(1)(A) has since been amended, but not in any way that affects Hagar's appeal. P.L. 1989, ch. 505, § 1 (effective Sept. 30, 1989) (codified at 17-A M.R.S. § 203(1)(A) (2018)); P.L. 2001, ch. 383, § 9 (effective Jan. 31, 2003) (codified at 17-A M.R.S. § 203(1)(A) (2018)).

2

infant son. Moreover, Hagar asks us to depart from our well-established *corpus delicti* doctrine and to adopt the federal "trustworthiness" standard.[2] We decline to do so and affirm the trial court's judgment.

## I. BACKGROUND

[¶2]   On April 7, 2017, a Cumberland County grand jury indicted Hagar for the 1979 intentional or knowing murder, 17-A M.R.S.A. § 201(1)(A) (Supp. 1978),[3] of his infant son. Hagar pleaded not guilty to the charge. On July 24, 2017, Hagar filed a motion to dismiss, arguing that the State could not establish *corpus delicti* for the homicide.

[¶3]   By agreement of the parties, the trial court held an evidentiary hearing on April 10, 2018, solely on the *corpus delicti* issue. Pursuant to the agreement, the State offered Hagar a conditional plea deal, allowing him to plead guilty to manslaughter for a fifteen-year sentence in the event that the

---

[2]   *See Opper v. United States*, 348 U.S. 84, 93 (1954) ("It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement.").

At oral argument, the State also asked us to consider abandoning or changing Maine's *corpus delicti* doctrine.

[3]   Title 17-A M.R.S.A. § 201(1)(A) has since been amended, but not in any way that affects this appeal. P.L. 2001, ch. 383, § 8 (effective Jan. 31, 2003) (codified at 17-A M.R.S. § 201(1)(A) (2018)).

trial court determined that the State had established *corpus delicti*.[4] M.R.U. Crim. P. 11(a)(2); *see State v. Reed*, 676 A.2d 479, 479-80 (Me. 1996).

[¶4] At the *corpus delicti* hearing, the parties submitted several exhibits in evidence, including the "Report of Investigation" and the autopsy records relating to the baby's death; a report from the forensic pathologist retained by the State to review those records; Hagar's medical records relating to his mental health; and documents, audio recordings, and video recordings containing various confessions and admissions by Hagar over the span of several years. The court also heard testimony from four witnesses: the baby's mother, who was also Hagar's wife at the time of the baby's death; a retired Brunswick police officer who, in 1979, responded to the 9-1-1 call reporting the baby's death; a Maine State Police detective; and the forensic pathologist retained by the State for this case.

[¶5] By order dated July 10, 2018, the court denied Hagar's motion to dismiss. In doing so, the court made the following factual findings, which are supported by competent evidence in the record. *See State v. Greenleaf*, 2004 ME 149, ¶ 13, 863 A.2d 877; *Reed*, 676 A.2d at 482.

---

[4] The agreement allowed either party to appeal an unfavorable *corpus delicti* determination.

4

[¶6] The baby was born on January 4, 1979; he was delivered several weeks early by C-section but did not have any unusual illnesses or medical conditions. In the months following the baby's birth, the relationship between his parents had deteriorated to some extent. The mother described Hagar as someone who needed a lot of attention and who occasionally displayed a violent temper, including throwing a dog against a wall in a rage.

[¶7] The mother was the baby's primary caretaker. She rarely left the baby alone with Hagar, in part because Hagar became uncomfortable when the baby cried. In caring for the baby, the mother followed what was then standard medical advice: she always placed the baby on his stomach when she put him in his crib and did not place any pillows, blankets, stuffed animals, or toys in the crib. At approximately four months of age, the baby was not yet able to roll over.

[¶8] On the day of his death—May 9, 1979—the baby experienced diarrhea and vomiting in the morning. During the day, the mother cooled the baby with a damp washcloth after noticing that he was sweating.[5] By the end of the day, however, the baby did not appear to be sick.

---

[5] Although the medical examiner's report of the baby's death states that the mother brought the baby to the hospital on the morning of May 9 to be examined, no medical record in the court's record corroborates this alleged visit.

[¶9]  At approximately 9:00 p.m. on May 9, the mother left the family's Brunswick apartment for twenty to twenty-five minutes to run an errand. When she left, Hagar was in the living room watching television and the baby was awake and also in the living room.  When the mother returned, the baby was no longer in the living room, and Hagar told her that he had put the baby to bed; the mother did not check on the baby at that time.

[¶10]  Shortly after the mother returned home, Hagar went into the bedroom and then screamed.  The mother rushed into the bedroom to find the baby lying face up in his crib, not breathing, his face gray; Hagar was standing next to the crib, distraught.  The mother or a neighbor called the police and then the mother attempted mouth-to-mouth resuscitation.  Paramedics soon arrived and took the baby to the hospital.  Although the mother went to the hospital that night, Hagar did not.

[¶11]  At the hospital, the baby was pronounced dead, his death attributed to "Sudden Infant Death Syndrome" (SIDS).  An autopsy of the baby's body performed on the day following his death revealed no internal injuries and no signs of an infection; the autopsy report stated that these findings were "consistent with" SIDS.

6

[¶12]  At the *corpus delicti* hearing, the officer testified that he was one of the first responders to the 9-1-1 call.  He explained that, when he entered the bedroom in 1979, he saw the baby lying on his back in the crib and a pillow at the head of the crib.  Before leaving the apartment for the hospital, the officer picked up the pillow, flipped it over, and observed a white or yellowish wet area of mucus or other fluid on the underside, approximately two inches in circumference.  The officer did not see anything suspicious or any signs that there had been a physical altercation in the bedroom.

[¶13]  After learning that the baby was dead and that his death had been attributed to SIDS, the officer wrote a brief report that indicated that the baby had been sick earlier in the day, but did not include in the report his observations concerning the pillow.  At the *corpus delicti* hearing, the officer explained that he thought the mucus on the pillow was consistent with the baby's illness.

[¶14]  Nearly two weeks after the baby's death, a Brunswick police detective interviewed Hagar.  Hagar told the detective that he had put the baby to bed in the crib while the mother was out of the apartment.  According to Hagar, he went back into the bedroom approximately forty-five minutes

later to check on the baby and found him bluish in color. The detective captioned his report of that interview "[baby's name] (Sudden Infant Death)."

[¶15] In May of 1991, Hagar's third wife—not the baby's mother—notified police that in 1988 Hagar had told her that he had smothered the baby with a pillow because he could not get the baby to stop crying. The third wife explained to police that she did not believe Hagar at first but that over time she had changed her mind; she also mentioned that Hagar had confessed to others, including his second wife, two of his brothers, and two of his mental health counselors.

[¶16] This disclosure from Hagar's third wife caused law enforcement officials to reopen their investigation into the baby's death, and on May 16, 1991, a Maine State Police detective interviewed Hagar. During that interview, Hagar confessed to killing the baby, and confirmed that he had confessed to several others over the years. Despite this confession, the State decided to close the investigation because it did not believe it could establish *corpus delicti*.

[¶17] In 2017, however, the Maine State Police again reopened the case; detectives reinterviewed Hagar about the baby's death in January and March of 2017. In those interviews, Hagar again confessed to killing his son.

8

[¶18]   After it reopened the case in 2017, the State asked a forensic pathologist to review certain records, including the baby's medical records and reports created at the time of the autopsy, as well as the January and March 2017 interviews with Hagar.  At the *corpus delicti* hearing, the forensic pathologist testified that although the medical and autopsy reports are consistent with SIDS,[6] they are not inconsistent with death caused by intentional smothering.  She explained that most post-mortem findings associated with death by intentional smothering occur as a result of the victim's struggle against the attack, but that a baby who is not even able to roll over would be unable to struggle.

[¶19]   Ultimately, the court found that the officer's testimony about the mucus on the underside of the pillow was credible and concluded that this testimony, coupled with other evidence,[7] established a "substantial belief that [the baby] was smothered":

> [I]t is significant that (1) [the mother] testified that she did not place any pillows in the crib (so a pillow should not have been

---

[6]   The forensic pathologist also explained that an unexplained death of a child under the age of one year is now identified as "Sudden Unexplained Infant Death."

[7]   The court determined that this "other evidence"—"Hagar's occasional displays of violent temper, his need for attention, his discomfort when the baby cried, the deterioration of his relationship with [the mother], and his failure to go to the hospital"—"would not raise a sufficient belief but constitute[d] warning signals that add[ed] weight to the corpus delicti finding."

there) and (2) the wet area was on the underside of the pillow (which [the baby] would not have been able to reach on his own).

The court also accepted the forensic pathologist's testimony that although the condition of the baby's body after death was consistent with SIDS, it was also consistent with asphyxiation. The court found that the State had "sufficiently established *corpus delicti*" and therefore denied Hagar's motion to dismiss.

[¶20] On August 28, 2018, the court held a sentencing hearing at which Hagar entered a conditional plea of guilty to manslaughter for his son's 1979 death.[8] The court sentenced Hagar to fifteen years in prison. Hagar timely appeals. *See* 15 M.R.S. § 2115 (2018); M.R. App. P. 2B(b)(1).

## II. DISCUSSION

[¶21] Hagar argues that the State failed to meet its *corpus delicti* burden pursuant to Maine common law and, alternatively, pursuant to the federal trustworthiness standard.[9] With regard to Maine's doctrine, Hagar asserts that the State failed to present sufficient evidence—independent of his

---

[8] As mentioned earlier, the conditional plea allowed Hagar to appeal the court's denial of his motion to dismiss.

[9] Hagar asks that we require trial courts to consider the reliability of a defendant's confessions rather than have courts focus exclusively on whether the State can produce independent evidence that a crime has been committed. *See Smith v. United States*, 348 U.S. 147 (1954); *Opper v. United States*, 348 U.S. 84 (1954). Because we see no reason to abandon our *corpus delicti* precedent, we do not address this part of Hagar's argument.

confessions—that would establish a substantial belief that someone had killed the baby.

[¶22]  Maine's *corpus delicti* doctrine imposes a preliminary evidentiary burden on the State: before the State can introduce in evidence an incriminating statement made by a defendant, it must establish, with evidence independent of that statement, that the crime charged actually occurred.  *State v. Poulin*, 2016 ME 40, ¶¶ 8-9, 134 A.3d 886.  The trial court—in its role as a gatekeeper—determines whether the State has established *corpus delicti*.  *See id.* ¶¶ 9-11; M.R. Evid. 104(a).  We review a trial court's *corpus delicti* determination in two parts: we review its factual findings for clear error and then we review de novo whether those facts are sufficient to establish probable cause to believe that a crime has been committed.  *State v. Fundalewicz*, 2012 ME 107, ¶ 10, 49 A.3d 1277.

[¶23]  Derived from the common law, Maine's *corpus delicti* doctrine is designed to "provide some measure of assurance that no one will stand convicted of a crime without independent evidence that a crime occurred." *Poulin*, 2016 ME 40, ¶ 8, 134 A.3d 886.  Thus, "[p]ursuant to this doctrine, before a defendant's self-inculpatory out-of-court statement may be admitted in evidence and considered by the fact-finder, the State must present

sufficient credible evidence to create a substantial belief that the crime charged has been committed by some person." *Fundalewicz*, 2012 ME 107, ¶ 8, 49 A.3d 1277 (footnotes omitted) (quotation marks omitted). The "substantial belief" burden of proof "is a low one," *id.* ¶ 9 (quotation marks omitted), and does not rise to the level of "beyond a reasonable doubt" or even to a "fair preponderance of the evidence," *Reed*, 676 A.2d at 481 (quotation marks omitted). Instead, we have described the "substantial belief" burden as "resembling the probable cause standard," existing "where the facts and circumstances within the knowledge of the factfinder would warrant a prudent and cautious person to believe that the crime was committed by someone." *Fundalewicz*, 2012 ME 107, ¶ 9, 49 A.3d 1277 (alteration omitted) (quotation marks omitted).

[¶24] When *corpus delicti* is at issue in a murder or manslaughter case, "the State must establish, with facts independent of the defendant's statements, (1) the fact of death of the victim; and (2) the criminal agency of another responsible for that death." *Reed*, 676 A.2d at 481 (quotation marks omitted). To meet its *corpus delicti* burden, the State is not required to prove the identity of the perpetrator or the mens rea element, and it need not disprove all other explanations for the death of the victim. *See id.*; *State v.*

*Anderson*, 409 A.2d 1290, 1301 (Me. 1979). Moreover, the trial court can make a *corpus delicti* determination based on circumstantial evidence and reasonable inferences. *Poulin*, 2016 ME 40, ¶ 17, 134 A.3d 886; *Fundalewicz*, 2012 ME 107, ¶ 11, 49 A.3d 1277.

[¶25] Although there are several cases in Maine addressing *corpus delicti* in the context of child deaths, *see State v. Cotton*, 673 A.2d 1317, 1320-22 (Me. 1996); *State v. Discher*, 597 A.2d 1336, 1338-40 (Me. 1991); *State v. Chapman*, 496 A.2d 297, 303-04 (Me. 1985), one case—*State v. Reed*, 676 A.2d 479—is particularly relevant. In that case, the seven-month-old infant son of Eric Reed died on October 29, 1989, while sleeping in a bed with Reed. *Id*. at 479-80. A police officer suspected Reed of smothering his son— and told the medical examiner as much—after the officer found a pillow on the bed next to the dead baby; the pillow had "a four-to[-]five-inch wet spot on the side that had been face down." *Id.* at 480. The state medical examiner, however, concluded that the cause of death was SIDS after finding no physical evidence of foul play during the autopsy. *Id.* The baby, before his death, had been healthy. *Id.*

[¶26] Reed was indicted for the murder of his son only after he confessed to police in 1993 that he had killed the baby. *Id.* at 479. The trial

court held a preliminary hearing on *corpus delicti* after Reed filed a pretrial motion to dismiss. *Id.* at 479-80. The court ultimately found that the State had met its burden of presenting sufficient evidence, independent of Reed's confession, to establish a substantial belief that the baby's death was a homicide, and denied Reed's motion to dismiss. *Id.* at 481. The trial court in *Reed* made several factual findings that were crucial to its ultimate conclusion on the *corpus delicti* issue:

> The location of the baby on the defendant's bed, the fact that he was face up with mucus discharge in his nose area and the location of the wet pillow case placed at the head of the bed face down strongly suggests that someone placed that pillow over the baby's face area for a sufficient period of time to cause a wet area to appear with an apparent mucus discharge in the center of the wet area. The baby could not have moved the pillow from his location to the head of the bed, nor could he have placed it face down.

*Id.* (quotation marks omitted). We affirmed the trial court's *corpus delicti* determination in *Reed*, holding that the facts in the record were "sufficient to establish a substantial belief that the infant died as the result of a criminal agency." *Id.* at 482.

[¶27] Here, as in *Reed*, the trial court made several factual findings, supported by competent evidence in the record, that are sufficient to establish a substantial belief that the baby's death was a result of criminal agency. *See*

14

*id.* at 480-82.  In this case, the trial court found that (1) the medical evidence presented by the State, through the forensic pathologist, was consistent with smothering; (2) the officer's testimony, including his revelation that he had discovered a wet spot on the underside of the pillow, was credible; (3) the pillow should not have been in the crib because the mother testified that she normally did not place pillows in the crib; and (4) the baby would not have been able to reach the underside of the pillow on his own.  Because these findings, when taken together, establish *corpus delicti*, the trial court did not err by denying Hagar's motion to dismiss.  *See Fundalewicz*, 2012 ME 107, ¶¶ 10, 13-14, 49 A.3d 1277; *Reed*, 676 A.2d at 481-82.

[¶28]  Hagar contends that although the facts in *Reed* are nearly identical to the facts in this case, we should nonetheless distinguish *Reed* because the officer's revelation concerning the pillow—thirty-five years after the fact—is not "sufficiently credible to create a substantial belief that the crime charged was committed by someone."

[¶29]  Although we acknowledge that, unlike the officer in *Reed*, the officer in this case did not report the wet spot on the pillow immediately after the baby's death, *compare with Reed*, 676 A.2d at 480 (describing how the officer there "informed the medical examiner that he believed the child had

been smothered"), it is not for us to weigh the credibility of a witness, *see Gordon v. Cheskin*, 2013 ME 113, ¶ 12, 82 A.3d 1221 ("We defer to the trial court's determination of witnesses' credibility . . . .").[10]  Here, the trial court's factual findings are supported by competent record evidence and "are sufficient to establish probable cause to believe" that someone killed Hagar's son.  *Fundalewicz*, 2012 ME 107, ¶ 10, 49 A.3d 1277 (quotation marks omitted).

The entry is:

Judgment affirmed.

---

Verne E. Paradie, Jr., Esq. (orally), Paradie & Rabasco, Lewiston, for appellant Burton B. Hagar

Aaron M. Frey, Attorney General, and Lara M. Nomani, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2017-1909
FOR CLERK REFERENCE ONLY

---

[10]  In this case, the trial court specifically addressed Hagar's concerns about the officer's credibility; in doing so, it explained that because the death had been ascribed to SIDS, and because the officer was aware that the baby had been vomiting the morning of his death, the officer had a plausible reason to not include his observation of the wet spot on the underside of the pillow in his 1979 police report.